666 So.2d 415 (1995)
Jack W. WALKER
v.
LOUISIANA HEALTH MANAGEMENT COMPANY.
No. 94 CA 1396.
Court of Appeal of Louisiana, First Circuit.
December 15, 1995.
Rehearing Denied January 30, 1996.
*417 Felix R. Weill, Ramond A. Daigle, Jr., Baton Rouge, For Plaintiff and Defendant in ReconventionAppellee, Jack W. Walker, Attorney For Defendant in Reconvention Appellee Gulf South Health Plans, Inc.
J. Arthur Smith, III, Durward D. Casteel, Baton Rouge, For Defendants-Appellants Community Health Network Inc., Louisiana Health Management Co.
Before LeBLANC, PITCHER and FITZSIMMONS, JJ.
PITCHER, Judge.
Louisiana Health Management Company (LHM) and Community Health Network of Louisiana, Inc. (CHN) appeal from a judgment of the trial court granting a motion for directed verdict on its claims of unfair trade practices, breach of fiduciary duty, and violations of the Uniform Trade Secrets Act against Jack Walker (Walker) and Gulf South Health Plans, Inc. (GS). We affirm.

BACKGROUND AND PROCEDURAL HISTORY
A master agreement dated November 1, 1988 was entered into by Community Health Network of Louisiana, Inc., the health maintenance organization (HMO) formerly known as Southeast Health Plan of Louisiana, Inc., Louisiana Independent Physicians Association (LIPA), Complete Health, Inc. and W.W. Featheringill & Co., Inc.[1] Additional parties to this master agreement were Complete Health Partners, Inc., Complete Health Louisiana, Inc., and Louisiana Health Management Company (LHM), a Louisiana general partnership that was to be formed after the execution of the master agreement. LHM was to have three (3) partners: Complete Health Louisiana, Inc., which would own 50.49% interest; LIPA, which would own a 48.51% interest, and the managing partner, who would own the remaining 1% of the partnership[2].
Under this agreement, Complete Health Partners, Inc. was to make available a total of $500,000.00 in cash to the HMO. In addition, the HMO was to receive a $500,000.00 note from LHM from the sale of the HMO's administrative rights. The agreement also provided for the formation of LHM to act as the administrator of the HMO's business and operations.
Walker was employed by LHM as its president pursuant to an employment agreement dated April 1, 1989. The employment agreement included provisions for the termination of an employee, with or without cause, by the company. Additionally, Section 8 of the employment agreement stated as follows:
8. The Employee and the Company have simultaneously herewith entered into an Agreement regarding confidentiality and non-competition, a copy of which is attached hereto and incorporated herein by reference as if fully set out herein.
Several management people, including Jim Little, executive vice-president of Complete Health, and the liaison between the Louisiana operation and Birmingham; Joseph McSorley, chief financial officer of Complete Health, LHM, and CHN; and William Featheringill, Chairman, president *418 and CEO of Complete Health, spoke of their encounters with Walker. These encounters ultimately lead to discussions among the Birmingham management about possibly terminating Walker from his employment with LHM.
The primary incident involving Walker and Birmingham management occurred after a meeting at the Browne-McHardy Clinic in New Orleans when Walker and Featheringill had a very heated discussion[3]. After this incident, Walker went to see Thomas Benton, the attorney for LIPA, and also for CHN. It was at this meeting with Benton that Walker first mentioned the possibility of going to work for GS[4].
Walker also called Dr. Edward Jeffries, who was employed by the Baton Rouge Family Medical Center and Baton Rouge General Hospital. Walker told Dr. Jeffries that he thought that he was going to be fired, and asked Dr. Jeffries to find out if Tom Sawyer (the head of General Health) would be interested in him if he were fired. Sawyer tried to call Walker two times at work but did not leave a message for him. When Dr. Jeffries told Walker that Sawyer had attempted to call him, Walker told Dr. Jeffries not to contact Sawyer on his behalf again because he had talked to Featheringill, and things seemed to be working out.
Walker was subsequently terminated from his position as president of LHM on January 30, 1990. On the date of his termination, Walker was presented with a proposed termination agreement, which he refused to sign. Shortly thereafter, Walker was informed by letter that LHM would comply with their obligations under the employment agreement concerning severance pay and retirement contributions. Walker was also informed that his severance pay would be paid on the 15th and last day of each month. On February 16, 1990, Walker demanded the entire amount of severance pay, due upon termination in accordance with LSA-R.S. 23:631. Walker was offered a position with GS as a senior vice-president on February 19, 1990, and reported to work on February 23, 1990. Subsequently, LHM informed Walker that he was terminated "for cause", and his severance pay was halted.
Walker filed suit against LHM for the payment of severance pay, provided for under his contract of employment, alleging that he had been terminated without good cause. Walker also alleged that he was entitled to penalty wages and attorney's fees pursuant to LSA-R.S. 23:631 et seq.
Thereafter, LHM answered Walker's petition and alleged that Walker had been terminated for cause. The answer listed several alleged breaches of Walker's contractual obligations.
On January 17, 1991, LHM filed a reconventional demand for damages against Walker, alleging that he had not only violated his contractual obligations but also his fiduciary duties as Chief Operating Officer of LHM and President of CHN. LHM further alleged that Walker had violated the Louisiana Unfair Trade Practices and Consumer Protection Law (LSA-R.S. 51:1405 et seq.). LHM also sought a permanent injunction, preventing Walker's continuing violations of the non-compete provision of his employment contract.
On October 23, 1991, LHM filed an amended reconventional demand and named CHN as a plaintiff-in-reconvention, alleging that since Walker was the President of CHN and owed statutory fiduciary obligations to the company, CHN had been damaged by Walker's actions. LHM also named as a defendant Gulf South Health Plans, Inc. (GS), another HMO. LHM alleged that GS was an active and knowing participant in Walker's actions.
On December 13, 1991, Walker and GS filed dilatory exceptions pleading the objections *419 of improper cumulation of actions and misjoinder of parties plaintiff and defendant. Walker and GS argued that GS could not be named as a defendant-in-reconvention and that CHN could not be named a plaintiff-in-reconvention.
On February 14, 1992, the minutes reflect that the trial court ruled that GS could be named as a defendant-in-reconvention under LSA-C.C.P. art. 1064, but ordered that CHN be declared an intervenor rather than a plaintiff-in-reconvention. The minutes also state that a judgment would be signed; however, there is no such judgment in the record.
On February 28, 1992, LHM and CHN filed a second amended reconventional demand to reflect that CHN appear as an intervenor and plaintiff-in-reconvention.
On May 4, 1992, GS filed a peremptory exception pleading the objection of prescription. GS argued that the claims of LHM and CHN sounded in tort, and had prescribed under the one year liberative prescriptive period for delictual actions. The minutes reflect that on June 26, 1992, the mover requested that this exception be referred to the merits of the case.
On October 20, 1992, plaintiffs-in-reconvention filed a third amended reconventional demand alleging that the actions alleged to have been committed by GS and Walker in the previous answer and reconventional demands constituted a violation of the Uniform Trade Secrets Act (LSA-R.S. 51:1431 et seq.).
This reconventional demand also asked for damages for the 1991-1992 enrollment years, alleging that in this time period, GS had continued to offer no out-patient prescription coverage while pricing its premiums below that of other HMOs. The reconventional demand further alleged that because CHN raised its premiums without greatly altering its coverage during this period, GS drew healthy state employees away from CHN, while diverting the older and infirm employees to CHN.
The damages for the 1992-1993 enrollment years allegedly arose as a result of the withdrawal as primary care physicians of CHN's state employees by the Baton Rouge Family Medical Center. It was alleged that this resulted in a number of CHN members terminating their relationship with CHN and enrolling in GS (in order to remain with their primary care physician). The reconventional demand alleged that the departure of the Baton Rouge Family Medical Center to GS was the result of unfair trade practices of Walker and GS.
On February 24, 1993, GS reurged its peremptory exception pleading the objection of prescription. Walker and GS also filed peremptory exceptions, alleging that LHM had failed to state a right of action, and had failed to state a cause of action with respect to Baton Rouge Family Medical Center. At this time, Walker and GS also answered all three reconventional demands, denying the allegations contained therein.
On November 23, 1993, the trial court signed a judgment which granted a motion in limine filed by Walker and GS. This motion prohibited the use of any oral evidence at trial submitted relative to the non-compete provision of the employment contract. The judgment further provided that LSA-R.S. 23:921, as it existed at the time the employment agreement was executed, was the applicable law in this action. LHM and CHN filed an application for supervisory writs with this court. This application was denied on November 24, 1993 (Docket No. 93 CW 2181). On November 29, 1993, the Louisiana Supreme Court granted the application for supervisory writs and reversed the trial court's in limine ruling. (Docket No. 93-CC-2918).
This matter was tried before a jury. At the close of the presentation of all of the evidence, Walker and GS moved for a directed verdict on all issues. The trial court granted the motion for directed verdict, finding that there had been no showing of any violations of the Uniform Trade Secrets Act, the Louisiana Unfair Trade Practice and Consumer Protection Law, and no breach of fiduciary duty. The trial court stated that there was no evidence that Walker had violated paragraph 8 of his employment agreement; thus, he found that Walker had been terminated without cause. The trial court *420 also determined that there was an insufficient expenditure of money towards the training of Walker, as required under LSA-R.S. 23:921, to enforce the non-competition agreement.
The jury was left to decide (1) whether Walker was entitled to severance; (2) if so, then what amount; (3) whether or not LHM was in good faith in failing to pay severance benefits and (4) whether Walker was entitled to a medical expense bonus and, if so, then the amount to which he was entitled.[5]
The jury awarded Walker $52,937.50 as severance pay and $2,310.00 as a medical expense bonus. The jury also found that LHM was in bad faith in failing to pay severance benefits. Therefore, the trial court awarded penalty wages and attorney's fees.
LHM and CHN have suspensively appealed, alleging the following assignments of error for our review:
1.
It was error for the District Court to direct a verdict on every issue of liability in this complex, multi-party, multi-claim litigation.
2.
The District Court erred in not allowing the jury to decide whether the parties, in fact, agreed to a non-competition agreement.
3.
The District Court erred in applying the version of LSA-R.S. 23:921 which was in effect prior to July 7, 1989, in determining the enforceability of the non-competition agreement. The District Court should have applied existing Louisiana law which has been in effect since July, 1989.
4.
The District Court should have allowed the issue of whether Jack Walker was fired for cause to be decided by the jury and it erred in determining, on a motion for directed verdict, that Jack Walker was discharged without cause.
5.
The verdict of the jury was tainted by the District Court's granting of the directed verdicts and its consequent failure to instruct the jury as to the claims of Louisiana Health Management Company and Community Health Network. The jury verdict was clearly wrong.

DIRECTED VERDICT
Through Assignment of Error Number One, LHM and CHN contend that the trial court erred in granting a motion for directed verdict on their claims against Walker and GS. LHM and CHN specifically complain of the trial court's finding that (1) Walker had not breached his fiduciary duty; (2) Walker and GS had not violated the Unfair Trade Practices Act; and (3) Walker had not violated the Trade Secrets Act.
LSA-C.C.P. article 1810 provides as follows:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
*421 A motion for a directed verdict is appropriately granted when, after considering all of the evidence in the light and with all reasonable inferences most favorable to the movant's opponent, it is clear that the facts and inferences point so overwhelmingly in favor of granting the verdict, that reasonable jurors could not arrive at a contrary verdict. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544/1545, p. 14 (La.App. 1st Cir. 3/11/94), 634 So.2d 466, 478, writ denied, 94-0906 (La. 6/17/94), 638 So.2d 1094; Barnes v. Thames, 578 So.2d 1155, 1162 (La.App. 1st Cir.), writs denied, 577 So.2d 1009 (La.1991). However, if there is substantial evidence opposed to the motion, that is, evidence of such a quality and weight that reasonable and fair-minded men exercising impartial judgment might reach different conclusions, the motion should be denied, and the case should be submitted to the jury. Belle Pass Terminal, Inc. v. Jolin, Inc., 634 So.2d at 478. Evaluations of credibility have no place in a decision on a motion for a directed verdict. Making credibility evaluations is one of the primary duties of the jury and the trial judge may not take this duty from the jury unless the party opposing the motion has failed to produce sufficient evidence upon which reasonable and fair-minded persons could disagree. Jones v. Merritt, 618 So.2d 14, 16 (La.App. 3rd Cir.), writ granted on other grounds, 625 So.2d 157 (La.1993).
A trial judge has much discretion in determining whether or not to grant a motion for directed verdict. Barnes v. Thames, 578 So.2d at 1162. The standard of review for the appellate court is whether, viewing the evidence submitted, reasonable people could not reach a contrary verdict. Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d 827, 849 (La.App. 1st Cir.), writs denied, 605 So.2d 1117, 1119 (La.1992). Moreover, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the claims. Adams v. Travelers Insurance Company, 589 So.2d 605, 608 (La.App. 2nd Cir.1991).
Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions. LSA-R.S. 12:91.
The Louisiana Unfair Trade Practices and Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." LSA-R.S. 51:1405A. To determine what constitutes unfair competition (or trade practices) must be decided on a case by case basis. Conduct is deemed unlawful if it involves fraud, misrepresentation, deception, breach of fiduciary duty, or other unethical conduct. Core v. Martin, 543 So.2d 619, 621 (La.App. 2nd Cir.1989).
LHM also alleged that Walker and GS violated the Uniform Trade Secrets Act (LSA-R.S. 51:1431 et seq.). The threshold inquiry in every trade secrecy case is whether a legally protectable trade secret exists in fact. "Trade secret" is defined in LSA-R.S. 51:1431(4) as follows:
(4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
The claims asserted by LHM and CHN are based on the following contentions. LHM and CHN contended that Walker, as head of LHM, had total knowledge of all aspects of the operations of LHM and CHN, including CHN's proposals to the state employees. LHM and CHN further contend that Walker went to work for GS at a crucial time, immediately before the submission of the proposals by CHN and GS to state employees in the Baton Rouge market. LHM and CHN alleged that Walker had taken part in discussions with CHN about this proposal prior to his termination. LHM and CHN further *422 alleged that Walker participated in similar discussions once employed at GS.
More specifically, it was alleged that Walker knew that CHN was going to substantially increase its pharmacy benefit in its upcoming bid to the state group. LHM and CHN alleged that Walker must have relayed this, and other confidential information to GS, because GS was able to formulate a very favorable bid to the state group. GS completely excluded prescription benefits from its bid and reduced its premiums. LHM contended that this move caused a large number of healthier and more profitable state employee members to switch to GS, while a large number of GS's sicker and unprofitable members switched to CHN.
Underlying the above allegations was the assertion by LHM and CHN that before leaving LHM, Walker had concocted a scheme in which he would leave LHM and go to work for GS. It was alleged that Walker enticed participating physicians and fellow employees to leave LHM for GS. LHM and CHN also alleged that Walker vowed "to put CHN out of business."
In support of its claims, LHM presented the testimony of David Ogden, an expert in actuarial science. According to Mr. Ogden, an actuary works primarily in the field of insurance, and attempts to estimate rates of illness, rates of changes in costs of treatments of illnesses, etc. Mr. Ogden had extensive experience with health insurance companies and with the setting of premiums and benefits.
Mr. Ogden testified that he analyzed a group of state employees (1,183) who had health care coverage with GS from July 1989 through June, 1990, who then switched to CHN on July 1, 1990. Mr. Ogden also analyzed a group of state employees (586) who switched from CHN to GS. Mr. Ogden looked at the various premiums and benefits offered by both CHN and GS. Mr. Ogden observed that CHN had increased its pharmacy benefit from $300.00 in 1989 to $1,000.00 while GS reduced its pharmacy benefit from $1,000.00 to $0. Mr. Ogden also noted that GS reduced its premiums while CHN increased its premiums.[6]
Mr. Ogden believed that healthy people would enroll in a program with lower premiums because they do not expect to use the benefits and would save money. In contrast, Mr. Ogden stated that sick people (one who spends more than average on health care) enroll in a program with good benefits.
Mr. Ogden concluded that the course of action taken by GS, in eliminating prescription benefits and lowering premiums, was done because they had "inside information" about what CHN was going to be doing. In reaching this conclusion, Mr. Ogden theorized that GS had assumed that the utilization rates (the rates at which people use health care) would decrease by 20%. To arrive at the percentage of 20%, Ogden first determined that the "average" premium increase was 19%[7]. Mr. Ogden stated that if benefits were not changed, then he would have expected GS's premiums to go up by 15%. Mr. Ogden then calculated that GS's average benefits declined by 8%. Mr. Ogden focused primarily on GS's pharmacy benefit because that was the most significant change made by GS. Mr. Ogden then stated that these two figures indicated that GS could have increased their premium by 5%. Instead, GS decreased their premium by 15%. Mr. Ogden stated that GS must have assumed that the utilization pattern would be 20% better then these percentages indicate. It was Mr. Ogden's opinion that if CHN had not changed its pharmacy benefit significantly, then CHN's benefit package would not have been extremely attractive to people who used a lot of prescription drugs because even though GS was eliminating its benefit, and CHN was left with a $300.00 pharmacy benefit, when you compare that to what the people *423 would have had to pay to get the coverage, it would not have been a very good buy.
Mr. Ogden stated that GS's proposal would have been imprudent and speculative without the benefit of insider information. Mr. Ogden explained that companies can only make assumptions about what a competitor will do in terms of premiums and benefits. Mr. Ogden stated that one would assume that premiums would go up because health care costs normally rise from year to year. Mr. Ogden further stated that one could assume that benefits would not change from year to year.
Mr. Ogden's testimony was based on the assumption that Walker knew or should have known what CHN was going to do in its proposal to the state employees.
To establish that Walker had the "insider information" relied upon by Ogden in rendering his opinion, LHM and CHN called several witnesses who testified that before leaving LHM, Walker had participated in discussions about the upcoming proposal to the state employees, and had recommended that CHN increase its pharmacy benefit. However, the exact amount of the increase recommended by Walker was never clearly established. Additionally, Jim Little testified that he made the final decision as to what the final proposal to the state employees would be on February 28, 1990. Mr. Little also testified that the decision to increase CHN's pharmacy benefit increase (to $1,000.00) was not made until shortly before CHN's proposal was submitted to the state, and after Walker had been terminated. Moreover, Walker testified that he had no knowledge of what CHN was going to do with the pharmacy benefit when he left their employ. Walker did testify that he approved the numbers in the proposal to the state employees made by GS.
Additionally, Patrick Powers, President and Chief Executive Officer of GS, testified that the decision to eliminate prescription benefits was made before Walker was hired.[8] Powers also testified that if Walker had told him that he knew what CHN's strategy was going to be, then they would not have discussed his employment until after March 1, 1990.
After a thorough review of the record, we find that when viewing the evidence submitted, reasonable people could not find for LHM and CHN against Walker and GS. The evidence does not establish that Walker had confidential information, particularly the amount of the increase in CHN's pharmacy benefit. Additionally, the allegation that Walker relayed confidential information to GS is supported solely by the speculative testimony of Ogden. Thus, the trial court did not err in granting the motion for directed verdict on these claims[9]. This assignment of error is without merit.
Through Assignment of Error Number Four, LHM contends that the trial court erred in granting the motion for a directed verdict on the issue of whether Walker had been terminated with or without cause, as provided for in the employment agreement. As noted earlier, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the claims. Adams v. Travelers Insurance Company, 589 So.2d at 608.
The employment agreement between Walker and LHM was executed on April 1, 1989. This agreement provided for the termination of an employee by the company, as follows:
9(b) By Company for Cause. The Company shall have the right to terminate the Employee's employment under this Agreement immediately for cause. For purposes hereof, the term "cause" shall mean dishonesty, habitual drunkenness or addiction to narcotics, conviction of a misdemeanor or felony involving moral turpitude, or the breach by the Employee of any material term or condition of this Agreement to be performed by him. In the event of the termination of the Employees' *424 employment by the Company pursuant to this paragraph 9(b), the Company shall be obligated to pay the Employee only his monthly base salary up to the date of termination.
9(c) By Company Without Cause. The Company shall have the right to terminate the Employee's employment under this Agreement immediately without cause. In the event of the termination of the Employee's employment pursuant to this Paragraph 9(c), the Company shall be obligated to pay the Employee only (i) his monthly base salary up to the date of termination and (ii) severance pay in an amount equal to six months salary. (Emphasis ours).
A contract between parties is the law between them, and the courts are obligated to give legal effect to such contracts according to the true intent of the parties. LSA-C.C. art. 2045; Bailey v. Franks Petroleum, Inc., 479 So.2d 563, 566 (La.App. 1st Cir.1985); G/O Enterprises, Inc. v. Mid Louisiana Gas Company, 444 So.2d 1279, 1285 (La.App. 4th Cir.), writ denied, 446 So.2d 318 (La.1984); Rebstock v. Birthright Oil & Gas Co., 406 So.2d 636, 640 (La.App. 1st Cir.), writ denied, 407 So.2d 742 (La.1981). This intent is to be determined by the words of the contract when they are clear, explicit, and lead to no absurd consequences. LSA-C.C. art. 2046; Thomas v. Knight, 457 So.2d 1207, 1209 (La.App. 1st Cir.1984); Campesi v. Margaret Plantation, 417 So.2d 1265, 1267 (La.App. 1st Cir.), writ denied, 422 So.2d 163 (La.1982).
Walker was informed on the morning of January 30, 1990, that he was terminated from his position as president of LHM. At this time, Walker was told to return to his office later that evening to retrieve his personal effects. When Walker returned, he was presented with a proposed termination agreement for his signature.
The proposed termination agreement provided that Walker was to be terminated without cause, in accordance with provision 9(c) of the employment agreement. Under the proposed agreement, LHM was to pay monthly, over six months on a prorated basis, the severance pay authorized in 9(c). The agreement also proposed that LHM would make additional payments to Walker of various benefits. In consideration for the "extra payments" and "in compliance with the `CONFIDENTIALITY AND NON-COMPETITION AGREEMENT'", Walker was to agree to several conditions, including
... not to contact or discuss with the public expressly including competitors, customers, providers, or any State or Federal agency any business of the company expressly including the termination without first coordinating and getting the approval for such communication with the Company. It is the purpose of this restraint to avoid damage to the company from any misstatement or perceived misstatement to these parties or disclosure of confidential information. This also expressly recognizes the fiduciary nature and confidentiality of the information of this company which of necessity Mr. Walker has had access, and which he has previously agreed to maintain confidential.
If Walker violated this termination agreement, the company would discontinue any severance payments, any additional payments, and revert the termination to one with cause.
The record indicates that Walker verbally refused to sign the termination agreement when it was presented to him. Also, in a letter dated February 1, 1990, Walker declined to accept the proposed termination agreement.
In a letter dated February 6, 1990, Little informed Walker that they were in receipt of his letter in which he declined the proposed termination agreement, and they were now withdrawing the offer. Little further informed Walker that LHM would comply with their obligations under the original employment agreement concerning severance pay and retirement contributions. Little also informed Walker that they expected him to comply with paragraph 8 of the employment agreement concerning confidentiality and non-competition with LHM and CHN. Walker was further informed that his severance pay would be paid on the 15th and last day of each month.
*425 The evidence reflects that Walker did in fact receive $4,812.50[10] on February 15, 1990. Additionally, in a separation of employment form sent to the Department of Labor dated February 14, 1990, LHM states that Walker was to receive $4,812.50 bi-monthly as severance/dismissal pay for a period of 6 months. The form also states that Walker was terminated "due to a difference in management philosophy".
On February 16, 1990, Walker responded to the February 6, 1990 letter from Little. Walker stated that the method of payment and conditions set forth in the letter were unacceptable. Walker demanded the entire amount of severance pay, due upon termination in accordance with LSA-R.S. 23:631[11]. In this letter, Walker also demanded his medical expense bonus for 1989.
On February 19, 1990, Walker was offered a position as senior vice president of operations at GS.
On March 8, 1990, William W. Featheringill, chairman of LHM, sent a letter to Walker. This letter began as follows:
We have just received word that you have accepted employment with Gulf South Health Plans, Inc. We consider this a very grievous violation of your basic fiduciary and contractual obligations with the company. For our former Chief Executive Officer to seek and obtain employment with its chief competitor just as we are about to go into the sales season is an unconscionable and deliberate effort to harm our company is totally contrary to the form and intent of your employment contract. After consultation with and approval by the Board of Community Health Network of your termination for cause, we are therefore refusing to go forward with any further consideration or payment of separation under Paragraph 9(c) of the contract.
The termination is hereby made under Section 9(b), "Termination for Cause"....
This letter gave the following causes for termination:
1) Refusing to take instructions concerning the sales program that the management wished to have implemented, all of which resulted in declining sales and a serious deterioration of good relations with a large segment of our providers.
2) Deliberate misrepresentation and manipulation of the relationship between the Birmingham management and Baton Rouge shareholders so as to diminish a good working relationship between all shareholders and aggrandize your own position.
3) Accepting employment with the principal competitor of the company, in violation of your word, representations, and agreement which of necessity will result in the communication of confidential information to the serious detriment of the company.
LHM asserts that the company was attempting to negotiate an amicable separation and the conditions of Walker's termination had not yet been finalized when he was terminated for cause on March 8, 1990. However, the actions taken by LHM prove otherwise. Based on the evidence presented before us, we conclude that reasonable people could not have reached a different conclusion; the record clearly supports a finding that Walker was terminated without cause. Thus, the trial court did not err in granting the motion for directed verdict on this issue. This assignment of error is without merit.

NON-COMPETITION AND CONFIDENTIALITY AGREEMENT
Through Assignment of Error Number Three, LHM contends that the trial court *426 erred in applying the version of LSA-23:921 which was in effect prior to July 7, 1989, in determining the enforceability of the non-competition agreement. LHM submits that the trial court should have applied existing Louisiana law which has been in effect since the 1989 amendment of LSA-R.S. 23:921.
We first find that the trial court correctly determined that the provisions of former LSA-R.S. 23:921, in effect at the time that this employment agreement was executed, were applicable in determining whether this non-competition agreement was enforceable. See First Page Operating Under The Name and Corporate Entity, Groome Enterprises, Inc. v. Network Paging Corporation, 628 So.2d 130, 134 (La.App. 4th Cir.1993), writ denied, 93-3193 (La. 2/11/94); 634 So.2d 379; Alexandria Anesthesia Service v. Firmin, 576 So.2d 1236 (La.App. 3rd Cir.), writ granted in part with order and denied in part, 580 So.2d 918, 927 (La.1991).
On the date that the employment agreement between Walker and LHM was executed, LSA-R.S. 23:921[12] provided as follows:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years.
The employment agreement which existed between Walker and LHM contained the following provision:
8. CONFIDENTIALITY AND NON-COMPETITION AGREEMENT. The Employee and the Company have simultaneously herewith entered into an Agreement regarding confidentiality and non-competition, a copy of which is attached hereto and incorporated herein by reference as if fully set out herein.
However, a confidentiality and non-competition agreement was not attached to Walker's employment agreement[13]. Through Assignment of Error Number Two, LHM contends that the trial court erred in not allowing the jury to decide whether the parties agreed to a non-competition and confidentiality agreement. LHM makes three contentions in support of a finding that a non-competition and confidentiality agreement existed between the parties. First, LHM presents facts which seem to support a contention that Walker destroyed *427 the agreement. Second, LHM argues that because the executed employment agreement references the confidentiality and non-competition agreement, then it should be construed as one document. Third, LHM contends that Walker's behavior is indicative of consent.
However, whether the non-competition agreement existed and was executed is irrelevant. In order to fall within the statutory exception contained in former LSA-R.S. 23:921, employers must spend substantial sums for special training or extensive advertising of the employee as the person to go to for the employer's type of business. Education For Living Seminars, Inc. v. Leone, 558 So.2d 250, 253 (La.App. 1st Cir.), writ denied, 559 So.2d 1378 (La.1990). Normal expenses of administration and supervisionsuch as employee sales and training meetings, the time spent breaking in a new employee, training courses in the administrative needs of the employer itselfcannot be considered the sort of "training" expense intended to justify the heavily disfavored non-competition agreement. Orkin Exterminating Company v. Foti, 302 So.2d 593, 597 (La.1974).
The only evidence presented by LHM to establish the training and advertising expenses incurred on behalf of Walker was the testimony of Jim Little. Mr. Little testified that it was an expensive process for the company to put into the Baton Rouge office its system of operations. According to Mr. Little, this process included the use of actuaries and auditors, and staff from the Birmingham office. This process also involved changing the accounting system and changing hundreds of medical provider agreements, and renegotiating agreements with hospitals. Mr. Little testified that Walker was trained how to operate their "unique" system of operation. There was no testimony offered by LHM to show what, if any, advertising expense was incurred of behalf of Walker.
Based upon the evidence presented, LHM failed to establish that it expended substantial sums towards the training of Walker or in the advertisement of Walker. Therefore, under former LSA-R.S. 23:921, the non-competition provision of the agreement which allegedly existed between Walker and LHM would be unenforceable. Thus, these assignments of error are without merit.[14]

ASSIGNMENT OF ERROR NUMBER FIVE
Based upon the result reached in Assignments of Error Numbers One and Four, we pretermit a discussion of the issue presented in this Assignment of Error.

CONCLUSION
The judgment of the trial court is affirmed. Costs of this appeal are to be borne by the appellants, Louisiana Health Management Company and Community Health Network, Inc.
AFFIRMED.
NOTES
[1] W.W. Featheringill & Co., Inc. is an Alabama corporation.
[2] Louisiana Health Partners, Inc., a Louisiana corporation to be formed after the execution of the Agreement, was the managing partner. Fifty-one percent of the common stock of this corporation was to be owned by Complete Health Partners, Inc., and the remaining 49% was to be owned by LIPA. The preferred, nonvoting stock was to be owned by the HMO.
[3] Apparently, Walker brought up the subject of Ame Howell to Featheringill. Ame Howell had been sent by the Birmingham people to help the Baton Rouge office with marketing. According to Featheringill, Walker asked him to take Ame out of the Baton Rouge office, and accused her of being a "corporate spy."
[4] We also note that Thomas Benton's calendar revealed that there had been a board meeting the previous day at which the possible termination of Walker was discussed.
[5] Under the terms of the employment agreement, LHM agreed to pay an annual bonus of up to 20% of Walker's base salary. The amount of the bonus was dependent upon (1) the enrollment as of March 31, 1990; (2) the ratio of Medical Expenses to Net Premium Income for January 1, 1989 through December 31, 1989; and (3) the pre-tax profit before expenses of Complete Health according to the Company's annual budget. The company could also, at its sole discretion, give the employee a bonus of up to 6% of his salary.
[6] Mr. Ogden testified that he did not look at any of the other HMOs who may have made proposals to the state employees because traditionally, when choosing an HMO, one looks to which physicians are on an HMO's list of providers. GS and CHN had a majority of the same physicians on their lists.
[7] Mr. Ogden looked to a survey done by the Group Health Association of American, which showed premiums in this region of the country to be increasing by 19%. Mr. Ogden reduced this number to 15% to be fair to GS and to account for any error in the survey.
[8] Several GS employees also testified that the decision as to the amount of benefits and premiums to be included in the state proposal had been made before Walker became employed.
[9] Based upon these reasons, we also find that LHM failed to establish that Walker violated any confidentiality agreement that may have existed.
[10] Before his termination, Walker's bi-monthly check was $4,962.50. Walker testified that the difference in the amount was due to the cessation of his car allowance of $300.00 per month upon his termination.
[11] LSA-R.S. 23:631 A provides, in pertinent part, as follows:

A. Upon the discharge or resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, not later than three days following the date of discharge or resignation.
[12] LSA-R.S. 23:921 now provides, in pertinent part, as follows:

A. Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.
* * * * * *
C. Any person, including a corporation and the individual shareholders of such corporation, who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment.
* * * * * *
G. Any agreement covered by Subsections B, C, D, E, or F of this Section shall be considered an obligation not to do, and failure to perform may entitle the obligee to recover damages for the loss sustained and the profit of which he has been deprived. In addition, upon proof of the obligor's failure to perform, and without the necessity of proving irreparable injury, a court of competent jurisdiction shall order injunctive relief enforcing the terms of the agreement.
[13] An unexecuted copy of a document entitled "Employment Agreement Regarding Confidentiality and Noncompetition" was filed into evidence.
[14] LHM also contends that the confidentiality agreement is not subject to the prohibition and requirements of LSA-R.S. 23:921. We agree. Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d 329, 334 n. 15 (La.App. 1st Cir.1984), writ denied, 467 So.2d 531 (La.1985). However, as more fully set out in Assignment of Error Number One, LHM failed to prove that Walker violated the confidentiality agreement even if one did exist.