789 So.2d 24 (2001)
George and Ava WICHSER
v.
Jude TROSCLAIR, Tammany Killman, Automotive Casualty Company and State of Louisiana, Through the Department of Transportation and Development.
Maureen Marie Morales, Individually and the Natural Mother and as the Court Appointed Administratrix, et al.,
v.
Jude Troxclair, Tammy Killian a/k/a Tammy Cummins, XYZ Insurance, Insurer for Jude Troxclair and Tammy Killian, et al.
Nos. 99-CA-1929 and 99-CA-1930.
Court of Appeal of Louisiana, Fourth Circuit.
February 28, 2001.
*25 Robert L. Kuhner, Metairie, LA, Counsel for Plaintiffs, George and Ava Wichser.
Glenn C. McGovern, New Orleans, LA, Counsel for Plaintiff/Appellees, Maureen Morales, et al.
Richard P. Ieyoub, Attorney General, Gustave A. Manthey, Jr., Assistant Attorney General, New Orleans, LA, Counsel for Defendant/Appellee.
Court composed of Chief Judge BYRNES, Judge JONES, and Judge BAGNERIS.
BYRNES, Chief Judge.
Plaintiffs-appellants, Maureen Morales, individually and as administratrix of the estate of her deceased minor daughter, Jessica Hupp, and Steven Hupp, and George and Ava Wichser, parents of the deceased Kelly Wichser, appeal a directed verdict dismissing their claims for personal injury damages against the State of Louisiana through the Department of Transportation and Development ("State"), arising out of an automobile accident that occurred on the Chef Menteur Highway on November 7, 1993.[1] We affirm.
Steven Joel Hupp, Jr., was a passenger in a Chevrolet Cavalier driven by Jude Trosclair. Anthony Francis was also a passenger in that vehicle. Kelly Wichser was driving a Ford Ranger in which Steven Hupp's sister, Jessica, was a passenger. All were teenage friends. They may or may not have been passing each other back and forth and may or may not have been speeding. When the vehicles collided, the two girls were killed. The boys all survived.
George and Ava Wichser filed suit against Jude Trosclair, Tammy Killian (the alleged owner of the vehicle driven by Trosclair), Automotive Casualty Co., her insurer, and the State of Louisiana, *26 through the department of Transportation and Development for wrongful death and survivor damages in connection with the death of their daughter, Kelly Wichser.
Maureen Marie Morales filed a separate suit as the natural mother of/and individually and as the court appointed administratrix for the succession of Jessica Hupp naming as defendants, Jude Troxclair, Tammy Killian, a/k/a Tammy Cummins, and the XYZ Insurance Company, their alleged insurer, the succession of Kelly Wichser, George and Ava Wichser, United Fire & Casualty Company[2], the insurer of the Wichser vehicle, the State of Louisiana Department of Transportation and Development, the Uniroyal Tire Company, Inc.[3], and the General Motors Corporation for wrongful death and survival damages in connection with the death of Jessica Hupp, as well as physical injuries and medical expenses sustained by Steven Hupp and the mental suffering he experienced as a result of witnessing the suffering and death of his sister, Jessica.
The State filed a cross claim and reconventional demand naming as cross-defendants all of the plaintiffs in the two suits described above. The two suits were consolidated.
The plaintiffs' appeal is based on the premise that, in granting the State's motion for directed verdict, the trial judge failed to consider all evidentiary inferences in the light most favorable to them as the opponents of the motion and applying a standard requiring the facts and inferences to so overwhelmingly favor the State that reasonable men could not arrive at a contrary verdict. The State responds that the plaintiffs failed to bear their burden of proof of causation. The plaintiffs do not contest the fact that they have the burden of proving causation.
In Lott v. Lebon, 96-1328, p. 4 (La.App. 4 Cir. 1/15/97), 687 So.2d 612, 615-616, writ den. 97-0359 & 97-0414 (La.3/21/97), 691 So.2d 95 this Court delineated the standards for the granting of a directed verdict by the trial court:
A trial judge has much discretion in determining whether or not to grant a motion for a directed verdict. Barnes v. Thames, 578 So.2d 1155 (La.App. 1st Cir.1991), writs denied, 577 So.2d 1009 (La.1991). A motion for a directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. New Orleans Property Dev. v. Aetna Cas., 93-0692 (La.App. 1st Cir.1994), 642 So.2d 1312, on rehearing; Adams v. Travelers, 589 So.2d 605 (La.App. 2nd Cir.1991). However, if there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. New Orleans Property Dev.; Adams.

Immediately following this statement, this Court went on to explain the standard of appellate review of directed verdicts:
On appeal, the standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court *27 concludes that reasonable people could not reach a contrary verdict. Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d 827 (La.App. 1st Cir. 1992), writs denied, 605 So.2d 1117, 1119 (La.1992).
Lott, p. 4, 687 So.2d at 616.
This Court then went on to note that based on the particular facts of the case before it that:
The record supports the conclusion of the trial judge compelling the granting of a motion for a directed verdict, based not on a credibility determination (a factual issue), but on a sufficiency of evidence determination (a question of law).
Lott, supra, p. 4, 687 So.2d at 616.
We agree with Walker v. Louisiana Health Management Co., 94-1396, p. 8 (La.App. 1 Cir. 12/15/95), 666 So.2d 415, 421 writ den. 96-0571 (La.4/19/96), 671 So.2d 922, where the court said:
Evaluations of credibility have no place in a decision on a motion for a directed verdict. Making credibility evaluations is one of the primary duties of the jury and the trial judge may not take this duty form the jury unless the party opposing the motion has failed to produce sufficient evidence upon which reasonable and fair-minded persons could disagree. Jones v. Merritt, 618 So.2d 14, 16 (La.App. 3rd Cir.), writ granted on other grounds, 625 So.2d 157 (La.1993). [Emphasis added.]
Thus in the language highlighted in the immediately preceding quote from Walker, an exception to the rule that the trial court should not make credibility calls arises where "the party opposing the motion has failed to produce sufficient evidence upon which reasonable and fairminded persons could disagree." The effect of this language in Walker is to suggest that the trial court should not make credibility calls except in those instances where no reasonable fact finder would credit the testimony, i.e., a standard equivalent to the manifest error standard of review at the appellate level. Under the manifest error standard of review, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, then the appellate court is entitled to find manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989). Concomitantly, it should not be error for the trial court to grant a motion for directed verdict where a jury verdict to the contrary would be reversible by this Court for manifest error, including credibility calls.
This Court's statement in Lott, supra, that the trial judge has much discretion in granting a motion for directed verdict must be reconciled with the requirement that reasonable men could not arrive at a contrary verdict. What this means is that the discretion of the trial court is really a discretion to deny the motion, not a discretion to grant the motion. In other words, it would not be error for a trial court to deny a directed verdict where reasonable men might disagree with the trial court decision to deny the motion for directed verdict, but it would be error to grant the motion where reasonable men might disagree with the decision to grant it. In effect, this brings us back to what we noted earlier: a directed verdict should be sustained on appeal where this Court would find a jury verdict in favor of the party opposing the motion to be manifestly erroneous had the trial judge allowed the case to go to the jury.
A review of the record reveals the following:
*28 Steven Hupp testified that, "Well, we played a little while. We were running ahead of each other and getting in front of each other." While this was going on Mr. Trosclair was speeding at speeds up to perhaps as much as eighty miles per hour. He testified further:
"And I told Jude to stop. We went into the still lane. We was going a little ways, we slowed down and for some reason we hit the side of the road where, the gravel and everything was, when we was getting back on the road, we lost control."
At the time Jude lost control, he heard, "Gravel, a large bang, that's all." He thought the bang might have been the ax[el] hitting the asphalt or the rim hitting the asphalt. According to Hupp, Trosclair was going way below the speed limit at the time he lost control.
He said that he and his neighbors had remarked on the dangerous nature of the highway prior to the accident. The car had a space saver spare tire on the right rear on the day of the accident. He recalled that Jude had his car up to eighty miles an hour in an attempt to overtake Kelly's vehicle. He said that they were well ahead of the girls when Jude swerved into an oncoming traffic lane for no apparent reason and he told Jude to stop. He could not explain why Jude then swang across the two west bound lanes of traffic. He slowed down in the right hand lane. "We were in the slow lane slowing down and then we hit the shoulder of the road." Stephen testified that they were travelling below 55 m.p.h. when they met the shoulder of the road.
When asked whether he could recall testimony he had given in his deposition four years prior to trial he said no because he had been trying to forget the accident since it happened. In that prior testimony he testified that his mother had been aware that Trosclair had no driver's license. He did not know why or what caused Trosclair to go off onto the shoulder. He stated that he could have just steered off.
When he noticed Jude fighting with the steering he looked back to see how close Kelly's truck was. He said he thought that if Kelly had slammed on the brakes she could have avoided the accident. He thought that the collision was a combination of Trosclair's car driving into the side of Kelly's truck and Kelly's truck striking the front of Jude's car. He said that he would not disagree with earlier deposition testimony that Kelly's truck was "way behind" Trosclair's car. The collision occurred in the fast lane. He never went over to inspect the shoulder of the road after the accident. He said that the car was sliding around in the gravel on the shoulder of the road. He did not get a driver's license until several months after the accident.
After considering all inferences in the light most favorable to plaintiffs, we still are unable to infer from Hupp's testimony what caused the accident. Were we acting as original fact finders we might infer that it was the irresponsible tag team driving of the inexperienced and unlicensed Trosclair that accounts for any fault he may have had in the accident, the remaining fault if any to be attributed to the speeding and game playing of the other driver. However, under the standard for reviewing the directed verdict, the most we are permitted to conclude is that Hupp's testimony failed to provide evidence of causation from which a reasonable fact finder could attribute causation to the State. As far as the State is concerned the result is the same.
The video deposition of Jude Trosclair, the driver of the vehicle that collided with *29 the truck driven by Kelly Wichser, was played for the jury. He had never had a driver's license and virtually no experience in highway driving. He testified that he was going 55-60 just prior to the accident. He thought that the speed limit at that point was 60. His left front fender made contact with Kelly's truck. According to Trosclair's testimony, at no time did his vehicle leave the highway. He recalled hearing nothing other than the impact. He got a three year suspended sentence with five years probation for a guilty plea to negligent homicide. He said his left front CV joint (the front left tire) was giving him trouble, but that the cause of the accident was: "I lost control. That's what mainly caused the wreck." "I felt a bump. When I hit the bump, that's what made me lose control of the car and when I got on the street, I hit something and it made me lose control." He never identified what that something might have been. He heard a noise "like my rim hit the wheel, or something like that, like a clang noise." It was the left front tire. He said that he might have changed lanes once and never went over 65 and the truck never went in front of him, all of which testimony is inconsistent with that of Hupp. He remembered his car going off the side of the road when he lost control. He said that hitting a hole in the street is what made him lose control, but no such hole was ever identified. At one point he said that his vehicle did not go off the roadway prior to the accident. He said he hit a hole in the roadway and his CV joint went out, causing him to lose control. He said that he was going about ten miles an hour at the time of impact and that there was no game playing between the two vehicles. He never identified the bump or hole that he hit that may have contributed to him losing control. It is difficult to believe that any reasonable fact finder could credit his self-serving story that he was only going ten miles an hour but couldn't control his car. Trosclair's story is not only inconsistent with that of Hupp, it is inconsistent with his guilty plea to negligent homicide. He made no mention of road conditions that may have caused the accident to police who arrived at the scene of the accident. In any event, his testimony does not point to a defect in the highway for which causation/fault could be assigned to the State.
The plaintiff called Mr. Richard Bonnafons, Sr. He has occasion to drive past the accident scene on Saturday evenings on the way to church services. He testified that in November of 1993 the highway was in terrible condition with ruts in both lanes "and the sides were kind of broken down."
He wrote two letters to General Patin of the State Highway Department complaining about the condition of the road prior to the accident. However, the stretch of highway that was mentioned in his letters was two to three miles east of the location of the accident. Moreover, when asked whether he had any recollection of the weekend of the accident he responded: "I would have absolutely no recollection of that particular weekend." Mr. Bonnafons offered no evidence specifically related to a defect that caused the accident, just vague, testimony about the poor condition of the highway in general tending to prove nothing about the cause of this particular accident.
Ken Odinet, the Louisiana State Representative for the area where the accident occurred, testified that there were three or four complaints made to his legislative office of gravel and dirt in the road in 1992 as a result of hauling dirt for a levee. He said he wrote to the State Police, the City Police and the Department of Highways expressing concern primarily about gravel and dirt in the road. He never went for any inspections of the road in the accident *30 area himself. He was merely passing on complaints. Representative Odinet's testimony proves nothing about the cause of this accident.
James R. Clary, Sr., a consulting civil engineer and land surveyor, qualified as an expert "in engineering with an emphasis on highway design." He was not qualified as an expert in highway maintenance. He went to the accident site on June 15, 1994 and November 23, 1994, long after the time of the accident. At the time of his June visit he took photographs.
Mr. Clary testified that the condition of the road and the shoulder did not meet the State Department of Highway maintenance manual. The standards of the American Association of State Highway and Transportation Officials (AASHTO) maintenance manual were not met either. He said the condition of the road would give a rough ride.
He testified that the condition of the roadside edge and shoulder were hazardous, although he had not been qualified as an expert in highway maintenance. He was not an expert in accident reconstruction. It was during his first visit to the accident scene in June of 1994 that Mr. Clary made the measurements which were the subject of his testimony. On cross examination Mr. Clary admitted that though he was at the site for five hours in June of 1994 he made no attempt to see how the condition of the road affected traffic. He testified that he did not see a pothole. He said: "Well, as I testified earlier, there are areas where the asphalt is gone from the concrete base below and that is a depression that could be called a pothole." And later: "I did not see a pothole, I saw a lost [sic] of surface materials and the concrete showing up through." The maximum drop off was three and one eighth inches. A video was taken on November 12, 1993, only five days after the accident. This video showed no vehicles losing control or experiencing sway at the scene of the accident.
Mr. Earl A. Luquet testified by video deposition that for some time prior to the accident he and the Venetian Isles Homeowners' Association had been complaining about the condition of the highway through correspondence with the State of Louisiana Department of Transportation and Development. "There were numerous potholes. There were sections of the highway where if your tires got caught in that section and you tried to move to either side, you were really hydroplaning, especially when it was raining. The shoulder of the highway was in bad shape. The highway is in deplorable shape. We asked the State to clean it up." In April of 1993 they received a response from the State indicating that the State wanted to wait until the levee system along the highway was finished because the trucks involved in the levee work would quickly undo any repairs. He did not know if there were any potholes where the accident occurred because he did not know the exact location of the accident. As Mr. Luquet did not even know the exact location of the accident his testimony fails to help plaintiffs prove causation for which the State could be held responsible.
Raymond Burkart, an accident reconstruction expert testified that Officer Schubert made substantial calculation errors in the police report. But Officer Schubert did not testify and the accident report was not admitted into evidence. He based his opinion on Trosclair's estimate that his vehicle was travelling perhaps as slowly as ten miles per hour immediately prior to the accident. But he could not give definitive testimony that any specific condition caused the Trosclair vehicle to leave the road and he could point to no specific defect at the accident scene that *31 caused the Trosclair vehicle to swerve back across the road, out of control at ten miles an hour into the vehicle driven by Kelly Wichser.
Based on the foregoing review of the entire record, we conclude based on the standard set forth above by this Court in Lott that "based not on a credibility determination (a factual issue), but on a sufficiency of evidence determination (a question of law)" that the plaintiffs failed to bear their burden of proof of causation. To put it another way, had the trial court allowed this matter to go to the jury based on the record as presented to this court, and had the jury found that the State caused or contributed to the cause of the accident, this Court would have reversed. Accordingly, the judgement of the trial court is affirmed.
AFFIRMED.
JONES, J., concurs in the result.
NOTES
[1] The judgment appealed from also grants a mistrial "as to the claims of plaintiffs, Maureen Marie Morales, individually and as administratrix for the Succession of Jessica Hupp, and Steven Hupp against the remaining defendants ... George Wichser, Ava Wichser and Jude Trosclair." This portion of the judgment granting a mistrial as to certain parties has not been made an issue by any of the parties to this appeal.
[2] The petition was later amended to correct the name to, "Southern United Fire Company."
[3] The petition was later amended to correct the name to, "Uniroyal Goodrich Tire Company."