HARRIET BARRINGER, HUGH BARRINGER, SANDRA KAIGLER, JOHN KAIGLER, FERLESSA JONES, CASSANDRA JINGLES, LISA SUPPLE, EDWARD SUPPLE, JR., NANCY WHITE AND LEE WHITE
v.
ENIZS ROBERTSON, HELEN TRAVIS, JOHNNIE W. JONES, RICHARD L. STALDER FOR THE LOUISIANA CORRECTIONAL INSTITUTE FOR WOMEN, AND LINDA GUIDROZ FOR THE LOUISIANA STATE PENITENTARY
2007 CA 0802
Court of Appeal of Louisiana, First Circuit.
October 31, 2008.
NOT DESIGNATED FOR PUBLICATION
J. ARTHUR SMITH, III, Counsel for Plaintiffs-Appellants, Lisa Supple, Edwards Supple, Jr., Nancy White and Lee White.
JAMES D. "BUDDY" CALDWELL, Attorney General, LAUREN B. BAILEY, Assistant Attorney General, Baton Rouge, Louisiana, Counsel for Defendants-Appellees Department of Public Safety and Corrections, Enizs Robertson, Helen Travis, Johnnie W. Jones, and Richard Stalder.
Before: PARRO, KUHN, DOWNING, GAIDRY, and WELCH, JJ.
KUHN, J.
Plaintiffs-appellants, Nancy White, Lisa Supple, former employees at the Louisiana Correctional Institute for Women (LCIW), and their respective spouses, appeal the trial court's judgment, granting a directed verdict and dismissing their claims against defendants-appellees, the State of Louisiana through the Department of Public Safety and Corrections, its Secretary Richard Stalder, Johnnie Jones in his capacity as Warden of LCIW, Helen Travis in her capacity as Assistant Warden of LCIW, and Enizs Robertson, an employee at LCIW. We reverse and remand.

BACKGROUND
White, a registered nurse (RN), an African-American, and Supple, a licensed practical nurse (LPN) who is a white, filed this lawsuit, alleging intentional infliction of emotional distress, negligent infliction of emotional distress, racial discrimination/harassment, retaliation, and disability discrimination[1] by their LCIW supervisor, Robertson.[2] Their husbands joined in the petition, alleging entitlement to loss of consortium damages.
According to the allegations of plaintiffs' petition, Robertson, an African-American, repeatedly stated that she hated white people and had a plan to get rid of the white nurses employed at LCIW. Robertson allegedly attempted to enlist White in her plan but, when White refused, then targeted White as well. White and Supple alleged that as a result of Robertson's behavior and the administration's failure to intervene or adequately investigate, they suffered emotional distress. Subsequent to defendants' answer of the lawsuit, generally denying the allegations, the matter proceeded to a trial by jury.
White and Supple rested following the presentation of their evidence and defendants moved for a directed verdict. The trial court granted defendants' motion and dismissed all of White and Supple's claims with prejudice. White and Supple appealed.

FACTS AND ANALYSIS
The motion for a directed verdict is a procedural device available in jury trials to promote judicial efficiency. Tanner v. Cooksey, 42,010 (La. App. 2d Cir. 4/4/07), 954 So.2d 335, 339, writ denied, 07-0961 (La. 6/22/07), 959 So.2d 508. La. C.C.P. art. 1810 provides:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
Generally, a motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. Pratt v. Himel Marine, Inc., 01-1832 (La. App. 1st Cir. 6/21/02), 823 So.2d 394, 406, writs denied, 02-2128 and 02-2025 (La. 11/01/02), 828 So.2d 571 and 572. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. Pratt, 823 So.2d at 406.
Evaluations of credibility have no place in a decision on a motion for a directed verdict. The making of credibility evaluations is one of the primary duties of the jury, and the trial judge may not take this duty from the jury unless the party opposing the motion has failed to produce sufficient evidence on which reasonable and fair-minded persons could disagree. Walker v. Louisiana Health Management Co., 94-1396 (La. App. 1st Cir. 12/15/95), 666 So.2d 415, 421, writ denied, 96-0571 (La. 4119/96), 671 So.2d 922; but see Wichser v. Troselair, 99-1929, pp. 4-5 (La. App. 4th Cir. 2/28/01), 789 So.2d 24, 27 (holding as an exception when no reasonable fact finder would credit the testimony, i.e., reliance on that testimony would be manifestly erroneous).
A trial judge has much discretion in determining whether to grant a motion for directed verdict. Walker, 666 So.2d at 421. The standard of review for the appellate court is whether, viewing the evidence submitted, reasonable persons could not reach a contrary verdict. Id. Moreover, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the claims. Id. On appeal, legal sufficiency of the evidence challenges, such as those presented by motions for directed verdict, are subject to the de novo standard of review that is used for all legal issues. Hall v. Folger Coffee Co., 03-1734 (La. 4/14/04), 874 So.2d 90, 99.
The trial court dismissed Supple and White's claims for negligent infliction of emotional distress based on the exclusivity provision in the workers' compensation law. Although Supple and White have challenged this ruling, on appeal, defendants concede that the claim for negligent infliction of emotional distress is not barred by the exclusivity provision of workers' compensation.[3] Accordingly, the issue before us is whether, based on the evidence presented, a reasonable juror could have concluded that White and Supple satisfied their burden of proving entitlement to recovery for negligent infliction of emotional distress.
Based on the testimonial and documentary evidence, we find substantial evidence opposed to the motion. The record contains ample evidence for reasonable and fair-minded jurors in the exercise of impartial judgment to reach different conclusions on whether White and Supple (and their husbands for loss of consortium) are entitled to recover damages for negligent infliction of emotional distress based on Robertson's conduct.
White testified that Robertson purposefully assigned her to the night shift because White would not cooperate with her stated intent to remove white nurses from LCIW and that Robertson hired her friends to work the day shift after White requested it for medical purposes. This testimony would support findings by the jury of a breach in Robertson's duty to treat White fairly. The jury could also find Robertson treated White unfairly based on White's testimony that Robertson modified her assignments and told LPNs that they did not have to listen to White because she was no longer their supervisor. And the testimony of White (and other former nurses) that Robertson assigned specific nurses to heavy-work assignments while giving others little or no assignments would also be sufficient evidence to support a finding of a breach of Robertson's duty to treat White fairly. White's testimony, along with that of her doctors, would permit a jury to conclude that the unfair treatment by Robertson caused elevated hypertension levels, anxiety, nervousness, and stress for which White received medical attention. Additionally, the injuries White sustained are among those within the scope of protection afforded by any breach of the duty to treat the RN supervisor fairly a jury might conclude was breached by Robertson.
Likewise, we find the record contains evidence that would support a jury's determination that Robertson breached her duty to treat Supple fairly. Supple testified how Robertson frequently detained Supple in her office, pulling her away from her job duties to berate her and speak derogatorily about other nurses. Supple also described how she had been physically blocked at the doorway, grabbed by the arm, and pulled back by Robertson into her office when she tried to leave. This evidence would be sufficient to support a finding that Robertson breached her duty to treat Supple fairly. Additionally, Supple's testimony that she was made to work four or six weekends in a row while others Robertson favored were off every weekend would also support a jury's finding that Robertson had breached her duty to treat Supple fairly. And a jury could find unfair treatment based on Supple's testimony that she was denied her pay during the time she used leave under Family and Medical Leave Act.[4] Insofar as her injuries, Supple's testimony, corroborated by her doctors, was that she required medical treatment to address symptoms arising from anxiety and depression. The medical testimony that the depression was related to work stress would provide a jury the evidentiary basis to find that a breach of Robertson's duty to treat Supple fairly was the cause-in-fact of her injuries. Finally, the injuries Supple sustained are those within the scope of protection afforded by such a duty that a jury might find was breached by Robertson.
Accordingly, we conclude the trial court erred in granting defendants' motion for a directed verdict, and reverse the judgment, dismissing all of plaintiffs' claims.[5]

DECREE
Having found that reasonable and fair-minded jurors in the exercise of impartial judgment could reach different conclusions on whether plaintiffs are entitled to recover damages for negligent infliction of emotional distress, we reverse the trial court's judgment, dismissing all plaintiffs' claims, and remand the matter to be heard before a jury. Appeal costs in the amount of $5034.50 are assessed against defendants-appellees, State of Louisiana through the Department of Public Safety and Corrections, Richard Stalder, Johnnie Jones, Helen Travis and Enizs Robertson.
REVERSED AND REMANDED.
PARRO, J., dissenting.
On appeal, Nancy White (White) and Lisa Supple (Supple) contend that the trial court erred in (1) entering a directed verdict on their claims for intentional and negligent infliction of emotional distress, (2) holding that their claim for negligent infliction of emotional distress lies in workers' compensation, and (3) dismissing their claims for racial harassment, retaliation, and disability discrimination.
The following facts are pertinent to the determination of whether the trial court abused its discretion in determining whether to grant the defendants' motion for directed verdict in connection with the various causes of action asserted by White and Supple. In 1995, Supple was diagnosed and treated for depression related to the death of her brother. She was also given medication for anxiety. In August 1997, Supple went to work as a licensed practical nurse (LPN) for the Louisiana Correctional Institute for Women (LCIW) in St. Gabriel, Louisiana. Supple submits that during her employment with the Louisiana Department of Public Safety and Corrections (DPSC) at LCIW, Enizs Robertson (Robertson), who had eventually been promoted to director of nursing after being hired as a registered nurse supervisor (RN supervisor) in late 1999, subjected her to various degrees and types of harassing behavior. According to Supple, Robertson often yelled at her, telling her that she hated white people and wished that God had never made them. Robertson told her that she did not understand why God did not put more black people on the Earth. Supple testified that she was kept at work by Robertson after the administration left for the day. During these detentions, Robertson would degrade Supple's co-workers by calling them fat, two-ton tussles, evil, trashy, and no-good. According to Supple, Robertson deliberately interfered with her work performance on a daily basis by calling her into her office and requiring other nurses to perform Supple's duties while she was detained by Robertson, who berated Supple and her co-workers. Supple testified that when she tried to leave the office, Robertson would begin rambling and would physically block the door to prevent her from leaving. If Supple succeeded in getting the door open, Robertson would grab her by the arm and pull her back in the office. According to Supple, Robertson became more aggressive over time in that Robertson threw things, slammed doors, yelled, and cursed. Supple reported that Robertson called her at home on several occasions in an effort to elicit information about Supple's co-workers and to find out if they were on Robertson's side.
Supple testified that she was told by Robertson not to speak to White, who was Supple's RN supervisor. Robertson told Supple that White was a black, ugly witch. When caught by Robertson speaking with White, Supple was informed that she would suffer disciplinary action if she continued to disobey Robertson's order. According to Supple, Robertson wrote her up for fictitious claims of wrongdoing, such as failing to report to duty when Supple had already received approved leave, failing to follow orders, and circumventing the chain of command when Supple was simply reporting Robertson's harassing conduct to Robertson's supervisor.
In October and November 2000,[1] Supple sought treatment with Dr. John Prejean, an internist, at the office of Dr. Eric J. Melancon for anxiety attacks, hypoglycemia, and a fungal infection of the toenail of her big toe. Dr. Prejean's impression was anxiety and depression related to her job situation for which he prescribed medication and referred her to a psychologist. She subsequently sought treatment from a social worker, Don Plaisance, for depression. Mr. Plaisance rated her anxiety disorder and work relations as mild in severity. Supple declined a psychiatric referral. Dr. Melancon testified that Dr. Prejean was able to control Supple's depression with medication.
In 1998, White went to work with LCIW as a RN supervisor on the 3:00 p.m. to 11:00 p.m. shift, with the expectation of being switched to the day shift. Within about a month, White was switched to the day shift. White testified that she would not have taken the job without assurance from the director of nursing that she would be working the day shift. White testified that she also worked part-time jobs, sometimes requiring that she work seven days a week.
Robertson, who was at the time also working as a RN supervisor, expressed her desire to White in becoming the director of nursing. According to White, Robertson stated that she did not care for white people and did not want any white people working for LCIW. White testified that Robertson informed her that if she worked with Robertson, White could become her assistant.
While White was on leave from work for two weeks following the death of her son in June 2000, Robertson called White at home daily seeking her assistance with Robertson's "plan" to get rid of the white nurses. During these conversations, Robertson told White that she had changed the work shifts just to make the nurses uncomfortable. According to White, when she declined to help Robertson with her plan, White became one of the people that Robertson did not want working at LCIW. Robertson indicated that she would build a paper trail against her until White either quit or was terminated. White indicated that Robertson believed that you were either with her or against her. Subsequently, Robertson began to write up White for false reasons. According to White, Robertson intentionally undermined White's authority as a shift supervisor, Robertson modified job assignments and told other nurses that they did not have to listen to White because she was no longer their supervisor, and Robertson assigned specific nurses heavy work assignments while giving others little or no assignments.
In September 2000, White was asked by Robertson to work the 11:00 p.m. to 7:00 a.m. shift. White, who suffered from high blood pressure, explained that she told Robertson that she could not work the night shift because she would experience problems with her blood pressure as she had in the past. Although Robertson assured her that it would only be for a short period of time, Robertson hired registered nurses who were placed on the 7:00 a.m. to 3:00 p.m. shift, forcing White to remain on the night shift.
According to White, working the night shift caused her to experience sleeplessness and problems with her blood pressure that produced headaches daily. She testified that because of the situation at work, she experienced nervousness, anxiety, stomach problems, lack of sexual desires, and disinterest in family functions. White testified that she sought treatment for anxiety and depression[2] from Dr. Jerry V. Williams,[3] an internist.
Dr. Williams testified that he saw White on September 18, 2000, for complaints of stress, dizziness, headaches, and crying, which she attributed to job stress related to the harassing behavior of the director of nursing.[4] He prescribed medication for nervousness, anxiety, and stress. At her September 25, 2000 appointment, Dr. Williams noted that the medication was helping. White testified that she did not like taking medication so she only took the medication for a couple of months. Nonetheless, she testified that her symptoms persisted for four or five months after her termination. At her next two visitsFebruary 12, 2001, and June 20, 2001for a blood pressure check, White made no mention of anxiety. Dr. Williams reported that during this time, her blood pressure bordered on being high, 140 over 90.
A March 1, 2001 list of problems that the nurses were having with Robertson included the following: confusion, unfair work assignments to specific nurses while other nurses did not have much to do, dispensing K-time and scheduling time off, hiring of Robertson's friends and promising them the day shift resulting in the movement of other nurses, threats to nurses who were involved in the complaints, doctor's excuses were not required of all nurses who called in sick, forcing sick nurses to stay on the job to pass pills, and preparation of night shift schedules which is usually done by the RN supervisor.
Although another doctor, who had been treating White for fluctuations in her blood pressure, indicated in April 2001 that White would benefit from working the day shift,[5] Robertson refused to place White on the day shift and responded that White must be looking for a day job. Instead, White was placed on the night shift for approximately a year while newly hired friends of Robertson were placed on the day shift.
By the time of White's termination on August 27, 2001, for attempting to remove copies of documentation from an LCIW office to support her grievance that Robertson was not being fair and was not performing her job properly, White had decided to resign because she felt that she was fighting a losing battle.[6] According to White, although employees were ultimately victorious in grievance proceedings, nothing ever changed in that Robertson was never made to comply with the rulings from these proceedings.
White and Supple's testimony as to Robertson's behavior was corroborated by the testimony of several of their co-workers. Sandra Kaigler (Kaigler), a white LPN and one of the plaintiffs, testified that she heard Robertson say that she needed to get rid of the fat, lazy nurses. According to Kaigler, Robertson claimed that she could do what she wanted because she had her supervisor, the warden, in her back pocket. Karen Bess (Bess), who worked as a RN supervisor with LCIW from September 2000 through 2002, testified that the conflict in the nursing staff existed before she went to work there. According to Bess, Robertson had an authoritarian (controlling) management style. She testified that Supple's conflict related mostly to her job assignment. Bess explained that the daily conflict on the job between nurses is to be expected because of the number of ladies working together. Although Bess was "pro-Robertson," Robertson spoke down to Bess and made her feel that whatever she did was not good enough. As stated by Dr. James Wilton Lorio, the medical director at LCIW and Robertson's supervisor, Robertson's attitude was dominating, provocative, and challenging. She had taken on an attitude of superiority and refused to take orders even from him.

Negligent Infliction of Emotional Distress
To succeed in a claim for negligent infliction of emotional distress, a claimant must show that (1) the defendant's conduct is negligent and (2) such conduct caused mental disturbance accompanied by physical injury, illness, or other physical consequences. See Moresi v. State, Through Dept. of Wildlife and Fisheries, 567 So.2d 1081, 1095 (La. 1990). Generally, if the defendant's conduct is merely negligent and causes only mental disturbance, without accompanying physical injury, illness, or other physical consequences, the defendant is not liable for such emotional disturbance. Moresi, 567 So.2d at 1095. Deviations from this general rule have occurred and recovery has been allowed: (1) against a telegraph company for the negligent transmission of a message, especially one announcing death, indicating on its face a potential for mental distress, (2) for the mishandling of corpses, (3) for failure to install, maintain, or repair consumer products, (4) for failure of a professional photographer to take wedding photographs or develop film, (5) for negligent damage to one's property while the plaintiffs were present and saw their property damaged, and (6) for fright or nervous shock, where the plaintiff was actually in great fear for his personal safety. Id. at 1096. Common to these categories of cases is the especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious. Id.; Falcon v. Our Lady of Lake Hosp., Inc., 98-0714 (La. App. 1st Cir. 4/1/99), 729 So.2d 1169, 1171.
After thoroughly examining the evidence in this case and considering all evidentiary inferences in the light most favorable to White and Supple, I believe that White and Supple failed to produce sufficient evidence on which reasonable and fair-minded persons could disagree as to whether this case falls within any category having an especial likelihood of genuine and serious mental distress. Since the facts of this case lack any recognized elements guaranteeing the genuineness of the injury claimed, I submit that White and Supple's claims for negligent infliction of emotional distress were appropriate for disposition pursuant to the defendants' motion for directed verdict. Therefore, I respectfully disagree with the contrary finding of the majority on this issue.

Intentional Infliction of Emotional Distress
Initially, White and Supple claimed their injuries were sustained as a result of the defendants' intentional infliction of emotional distress. The basis for the tort of intentional infliction of emotional distress in Louisiana is LSA-C.C. art. 2315, as illuminated by the restrictions and guidelines enunciated in the American Law Institute's Restatement (Second) of Torts § 46.[7] Nicholas v. Allstate Ins. Co., 99-2522 (La. 8/31/00), 765 Sold 1017, 1021. "One who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subjected to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." White v. Monsanto Co., 585 So.2d 1205, 1209 (La. 1991). To recover damages for intentional infliction of emotional distress, a plaintiff must prove that: (1) the conduct of the defendant was extreme and outrageous, (2) the emotional distress suffered by the plaintiff was severe, and (3) the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. Id.
Although I believe that Robertson's managerial style was very undesirable, I submit that no reasonable person could have concluded that Robertson's conduct rose to the level of being so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. See White, 585 So.2d at 1209. Her offensive behavior was more in the nature of mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities for which liability does not extend, as persons must necessarily be expected to be hardened to a certain amount of rough language and to occasional acts that are inconsiderate and unkind. Id.
In support of its finding that White and Supple had failed to prove severe emotional distress, the trial court observed that White and Supple had not been diagnosed as suffering from major depression and that neither had been hospitalized for their depression and anxiety. White and Supple contend the trial court erred in requiring hospitalization and/or major depression to prove severe emotional distress. Although I agree with White and Supple that severe emotional distress may be shown in the absence of a diagnosis of major depression or a hospitalization, I submit that no reasonable person could have found that the duress suffered by White and Supple at the hands of Robertson was of such a nature that no reasonable person could be expected to endure it.[8] In my opinion, no reasonable person could have found that the fright, humiliation, embarrassment, or worry[9] suffered by White and Supple rose to the level of severe emotional distress required for the imposition of liability for intentional infliction of emotional distress.
Thus, I feel that the motion for directed verdict dismissing White and Supple's claims against the defendants for intentional infliction of emotional distress was properly granted in this case.[10]

Retaliation
Supple and White contend that they were the subjects of racial harassment and retaliation. In 1988, the Louisiana Legislature enacted the Louisiana Human Rights Act (LHRA) and created the Louisiana Commission on Human Rights (Commission) to enforce the Act. LSA-R.S. 51:2231 et seq. As part of its original charge, the Commission was granted statutory authority to address allegations of unlawful discriminatory practices in employment. See LSA-R.S. 51:2242-2245 (repealed by 1997 La. Acts, No. 1409, § 4, effective August 1, 1997). The legislature also included a broad anti-retaliation provision in the LHRA, making it unlawful to retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by the LHRA, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under the LHRA. LSA-R.S. 51:2256. However, in 1997, the Louisiana Legislature consolidated all of the state's employment discrimination law into one, comprehensive chapter. See LSA-R.S. 23:301, Historical and Statutory Notes. Pursuant to Act 1409, the provisions of LSA-R.S. 51:2242-2245 were repealed and replaced by the new Louisiana Employment Discrimination Law (LEDL), LSA-R.S. 23:301 et seq. Thus, the issue is whether the anti-retaliation provision set forth in LSA-R.S. 51:2256 continues to apply to employment discrimination after the 1997 revisions.
The legislature, while repealing the substantive sections dealing with employment discrimination, added the following two definitions to LSA-R.S. 51:2232 of the LHRA as part of the 1997 amendments:
(12) "Discriminatory practice in connection with employment" means an employment practice prohibited by R.S. 23:312, 323, or 332.
(13) "Unlawful practice" means a discriminatory practice in connection with employment, a discriminatory practice in connection with public accommodations, or any other practice prohibited by this Chapter. The Louisiana Legislature was aware of the language of Title VII of the Federal Civil Rights Act when it removed the employment discrimination provisions from the LHRA and consolidated them under Chapter 3-A of Title 23 of the Louisiana Revised Statutes. See King v. Phelps Dunbar, L.L.P., 98-1805 (La. 6/4/99), 743 So.2d 181, 185.
Like Title VII, the LEDL contains an express cause of action and specifically delineates the types of conduct that it prohibits. The LEDL does not contain a broad anti-retaliation provision that applies to all forms of discrimination prohibited under the law. Rather, the legislature included specific anti-retaliation provisions in the sections addressing age discrimination (LSA-R.S. 23:311-314) and sickle-cell trait discrimination (LSA-R.S. 23:351-354). See LSA-R.S. 23:312(D) and 352(D). Parallel anti-retaliation provisions do not appear in the sections addressing disability (LSA-R.S. 23:321-325); race, color, religion, sex, and national origin (LSA-R.S. 23:331-334); or pregnancy, childbirth, and related medical conditions (LSA-R.S. 23:341-342). Had the legislature intended to include parallel provisions in the other sections, it would have done so. Smith v. Parish of Washington, 318 F.Supp.2d 366, 373 (E.D. La. 2004). There is no evidence to support the contention that the legislature intended LSA-R.S. 51:2256 to apply to some sections of the LEDL and not to others, simply by virtue of the fact that some sections do not contain anti-retaliation provisions. On the contrary, the fact that some sections do contain such provisions indicates that the legislature intended not to include similar provisions in the other sections. Smith, 318 F.Supp.2d at 373. This interpretation is buttressed by the fact that the sections specifically addressing employment discrimination in the LHRA were repealed. And the inclusion of definitions pertaining to employment discrimination in a statute (LSA-R.S. 51:2232) in which substantive employment discrimination provisions were repealed does not create causes of actionit simply creates confusion. Smith, 318 F.Supp.2d at 373.
Clearly, as a matter of law, LSA-R.S. 51:2256 no longer applies to unlawful employment discrimination as the LEDL does not contain such a provision. Smith, 318 F.Supp.2d at 373. Whether this absence is the result of drafting errors is not for the court to determine. Id. It is well established in matters of statutory interpretation that courts begin with the plain language and structure of the statutes. See LSA-C.C. art. 9; LSA-R.S. 1:4. When the language is clear, as it is in this case, the court looks no further to find the intent of the legislature. See Id.
Accordingly, liability under LSA-R.S. 51:2256 is limited to retaliation against practices made unlawful under the LHRA and does not extend to provisions repealed from that act which are now incorporated into LSA-R.S. 23:301 et seq. Smith, 318 F.Supp.2d at 373; see Lowry v. Dresser, Inc., 04-1196 (La. App. 3rd Cir. 2/2/05), 893 So.2d 966, 968. Furthermore, Supple and White's claims clearly do not allege discrimination under the LEDL based on age or sickle-cell traits. Therefore, as a matter of law, there is no remedy for retaliation in this matter.

Racial Harassment
Concerning intentional discrimination in employment, LSA-R.S. 23:332(A) of the LEDL provides as follows:
It shall be unlawful discrimination in employment for an employer to engage in any of the following practices:
(1) Intentionally fail or refuse to hire or to discharge any individual, or otherwise to intentionally discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin.
(2) Intentionally limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee, because of the individual's race, color, religion, sex, or national origin.
Because this statute is similar in scope to the federal anti-discrimination prohibitions in Title VII of the Federal Civil Rights Act of 1964,[11] Louisiana courts have routinely looked to the federal jurisprudence for guidance in determining whether a hostile work environment claim based on racial harassment has been asserted under LSA-R.S. 23:332(A). See Chaney v. Home Depot, USA, Inc., 05-1484 (La. App. 4th Cir. 8/16/06), 940 So.2d 18, 21-22, writ denied, 06-2286 (La. 11/22/06), 942 So.2d 559; see also St. Romain v. State, Through the Dept. of Wildlife and Fisheries, 03-0291 (La. App. 1st Cir. 11/12/03), 863 So.2d 577, 587, writ denied, 04-0096 (La. 3/26/04), 871 So.2d 348; Hicks v. Central Louisiana Elec. Co., Inc., 97-1232 (La. App. 1st Cir. 5/15/98), 712 So.2d 656, 658.
White and Supple allege they were subjected to a hostile work environment. A hostile work environment is one that does not affect an employee's economic benefits, but instead creates a hostile or offensive working environment. Hicks, 712 So.2d at 658. In order to prevail in a hostile work environment claim, plaintiffs must assert and prove: 1) they belong to a protected group; 2) they were subjected to unwelcome harassment; 3) the harassment was motivated by discriminatory animus (race); 4) the harassment affected a term, condition, or privilege of employment; and 5) the employer knew or should have known of the harassment and failed to take proper remedial action. Id. at 658-59.
In determining whether an actionable hostile work environment claim exists, courts look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Alcorn v. City of Baton Rouge, 02-0952 (La. App. 1st Cir. 12/30/04), 898 So.2d 385, 389, writ denied, 05-0255 (La. 4/8/05), 899 So.2d 12.
The trial court found that even though racially degrading terms were used by Robertson, the complaints by various witnesses, black and white, were based on the same or similar treatment. Based on this finding, the trial court concluded that White and Supple failed to produce sufficient evidence as to their claim for racial harassment on which reasonable and fair-minded persons could disagree. Robertson's controlling and demanding management style was far from desirable and very ineffective from a morale standpoint. Nonetheless, the evidence does not show that her treatment of one protected group of people differed from her treatment of another protected group of people. Seemingly, she had a problem with anyone who was not "pro-Robertson." The testimony of Karen Bess suggests that even those who were "pro-Robertson" felt threatened by Robertson's management style. According to White, the nurses tended to avoid Robertson rather than being confrontational with her because they knew the type of person that she was from having worked with her previously. Furthermore, although Robertson's conduct was offensive, I submit that it was not so severe and pervasive as to create a hostile environment. After reviewing the evidence submitted, I agree with the trial court that reasonable persons could not have reached a verdict in favor of White or Supple on the issue of being subjected to a hostile work environment. Accordingly, I feel that the motion for directed verdict, dismissing White and Supple's claims against the defendants relating to a hostile work environment based on racial harassment, was properly granted in this case.

Disability Discrimination
Before going to work for LCIW, Supple had injured her hip in a motor vehicle accident in 1982, which caused her to experience a great deal of pain and trouble when walking. Supple testified that Robertson made fun of her limp and ridiculed her to other nurses. In June 1999, the hardware that had been placed in Supple's hip and leg was surgically removed; however, her treating physician cautioned that she may still be symptomatic because of the osteoarthritis in her left hip.
By letter dated August 10, 1999, Supple informed the director of nursing that she was interested in the position of trip coordinator[12] if and when it became available. In this letter, she stated:
You are all well aware of my medical condition and although I am capable of continuing in my present capacity, in light of my medical condition and all other factors I feel that a move to this position would be beneficial to myself and I wish you would please consider me for this position.
Subsequently, Supple, with the approval of the medical director, was assigned by the former director of nursing to perform the work of the trip coordinator.[13] The record does not disclose how long Supple performed such work before being reassigned by Robertson to full LPN duties on the floor. Although the trip coordinator was a full-time job, Supple conceded that she was also required to perform other duties as a LPN during this time.[14]
In 2001, Supple was removed by Robertson from the desk job as the trip coordinator[15] and assigned to work as a LPN on the floor. Supple testified that this occurred at a time when she was having difficulty walking and was in need of a hip replacement. While performing floor work, Supple was required to stand on her feet for 12-14 hours per day without a lunch break and to lift patients weighing more than 200 pounds unassisted. Because she experienced difficultly performing the floor work, Supple requested that Robertson return her to the trip coordinator job. This request was denied.
On November 19, 2001, Supple applied for and was granted medical leave time to undergo a total replacement of her left hip. Surgery was performed on November 25, 2001. Supple did not work for approximately three months. Because her available leave time would be used up by February 18, 2002, Robertson scheduled Supple to return to work on February 20, 2002. Since she was not scheduled for a follow-up appointment with her doctor until March 18, 2002, Supple filed a request for an extension of her leave time on February 16, 2002. Robertson recommended that Supple's request be denied because of her remiss work performance and because of the fact that her sick leave, K-time leave, and annual leave balances were zero. Based on Robertson's recommendation, Supple's request for an extension was denied in accordance with LCIW's regulation 1-03-016.
When she returned to work on April 2, 2002, Supple presented Robertson with the restrictions that had been placed by her treating physician on her ability to perform certain tasks.[16] Although Robertson indicated that she would work with her, Supple testified that she was required to work in the same manner following her hip surgery despite the restrictions placed by her treating physician that she not lift over 10 pounds, bend, stoop, or climb. On April 5, 2002, Supple sent a letter to LCIW requesting accommodations, i.e., that she not be required to lift, carry, or pull up to 40 pounds, and she not be required to perform work that was inconsistent with her restrictions. According to Supple, that request was not honored. Supple resigned from her position with LCIW on May 2, 2002, without giving reasons.
Louisiana Revised Statutes 23:321 through 325[17] of the LEDL were designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities. The purpose of the law is to allow disabled persons to compete in the workplace and the job market based on the same performance standards and requirements expected of persons who are not disabled. It is not a job insurance policy but rather a legislative scheme for correcting illegitimate inequities faced by the disabled. See Hook v. Georgia-Gulf Corp., 99-2791 (La. App. 1st Cir. 1/12/01), 788 So.2d 47, 55, writ denied, 01-1098 (La. 6/1/01), 793 So.2d 200.
These provisions of the LEDL are modeled after the Americans with Disabilities Act, 42 USC § 12101 et seq. In interpreting Louisiana's employment discrimination laws, courts have relied on similar federal statutes and the federal jurisprudence interpreting those statutes. See Thomas v. Louisiana Casino Cruises, Inc., 03-1937 (La. App. 1st Cir. 6/25/04), 886 So.2d 468, 470, writ denied, 04-1904 (La. 10/29/04), 885 So.2d 598; Hicks, 712 So.2d at 658.
On appeal, Supple submits that she was subjected to discrimination on the basis of a disability, in violation of LSA-R.S. 23:323, when she was denied reasonable accommodations for her hip, that is, being returned to the trip coordinator position. In pertinent part, LSA-R.S. 23:323 provides:
A. No otherwise qualified disabled person shall, on the basis of a disability, be subjected to discrimination in employment.
B. An employer, labor organization, or employment agency shall not engage in any of the following practices:
(1) Fail or refuse to hire, promote, or reasonably accommodate an otherwise qualified disabled person on the basis of a disability, when it is unrelated to the individual's ability, with reasonable accommodation, to perform the duties of a particular job or position.
(2) Discharge or otherwise discriminate against an otherwise qualified disabled person with respect to compensation or the terms, conditions, or privileges of employment on the basis of a disability when it is unrelated to the individual's ability to perform the duties of a particular job or position.
Thus, an "otherwise qualified disabled person" shall not be subjected to discrimination in employment based on a disability.[18] An "otherwise qualified disabled person" means a disabled person who, with reasonable accommodation, can perform the essential functions of the employment position that such person holds or desires. LSA-R.S. 23:322(8). A "reasonable accommodation" is an adjustment or modification to a known physical limitation of an otherwise qualified disabled person which would not impose an undue hardship on the employer. LSA-R.S. 23:322(9). Louisiana Revised Statute 23:322(8), when read in conjunction with LSA-R.S. 23:323(B)(1), contemplates an adjustment or modification (i.e., an accommodation) which would enable an individual to overcome a physical disability so that he or she would then have the ability to perform the duties of the particular job or position in question. See Riddle v. Louisiana Power and Light Co., 94-1386 (La. App. 1st Cir. 4/7/95), 654 So.2d 698, 701, writ denied, 95-1599 (La. 9/29/95), 660 So.2d 871. The law does not require that LCIW reassign Supple to a new position as a reasonable accommodation. See Id. at 703.
In her testimony, Supple indicated that the following three factors played a role in her resignation: her physical inability to perform the duties Robertson required of her, Robertson's treatment of her, and the problems involved with using leave time. Following her resignation, Supple was out of work for approximately three months before taking a job with a nursing home, but the details about that job are not in evidence, She left the nursing home job to return to state employment at Hunt Correctional Center (Hunt). At Hunt, she worked in the infirmary, which she described as not as demanding as her LPN job at LCIW. After two years, Supple left Hunt because she could no longer perform the duties of her job as she was experiencing difficulty with her back and hip from being on her feet too long. At the time of trial, she held a less physically demanding job that required her to go into people's homes to perform physicals, draw blood, or retrieve urine samples and prepare documentation.
Supple testified that she believed that she could have performed her job at LCIW if accommodations would have been made based on the restrictions outlined by her doctor; however, she subsequently resigned from a less demanding LPN job at Hunt because she could no longer perform the job. Clearly, Supple was currently unable to perform the LPN duties that she was hired to perform for LCIW.
After thoroughly considering the evidence in the record and Supple's suggestion of a reasonable accommodation, which admittedly required that she perform LPN duties in addition to the duties of the trip coordinator,[19] I believe that no reasonable person could have found that Supple satisfied her burden of proving that she was an "otherwise qualified disabled person" as defined by the LDEL.[20] Accordingly, I feel that the motion for directed verdict, dismissing Supple's claim against the defendants for disability discrimination, was properly granted in this case.
For the foregoing reasons, I would affirm the judgment of the trial court. Therefore, I respectfully dissent from the majority's reversal of the dismissal of White and Supple's claims and remand of this matter for a second jury trial on all of these issues.
NOTES
[1] The claims of several other co-employees were resolved prior to the trial of this matter, leaving only those of White, Supple, and Sandra Kaigler. Kaigler has not appealed the dismissal of her claims.
[2] It is apparently undisputed that White and Supple were classified civil service employees. Defendants filed a motion seeking to invoke the exclusivity of the Civil Service Commission (Commission) for disposition of their claims in this lawsuit. But White seeks damages beyond the scope of those the Commission's jurisdiction; and Supple voluntarily resigned from her civil service employment and, thus, their claims are not circumscribed by the exclusive jurisdiction of the Commission. See McCain v. City of Lafayette, 98-1902 (La. App. 3d Cir. 5/5/99), 741 So.2d 720. 724-28. Accordingly, the trial court correctly denied defendants' motion to dismiss this lawsuit on the basis of the alleged jurisdictional defect.
[3] See Richardson v. Home Depot USA, 00-0393 (La. App. 1st Cir. 3/28/01), 808 So.2d 544.
[4] See 29 U.S.C.A. § 2601. et seq.
[5] Because we have found the trial court erred in its conclusion that a reasonable jury could reach different conclusions on plaintiffs' entitlement to damages for negligent infliction of emotional distress and reversed its dismissal of all plaintiffs" claims, we pretermit a discussion on each theory of recovery the plaintiffs allege is supported by the evidence. See 1 Frank L. Maraist & Harry T. Lemmon, Louisiana Civil Law Treatise § 11.8 (1999) (pointing out that it is unclear whether a trial judge can grant a partial directed verdict dismissing one theory of recovery or element of damages); but cf. Federal Rule of Civil Procedure 50 (If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may resolve the issue against the party).
[1] A fetter dated November 3, 2000, from the assistant warden of treatment and social services to all LCIW medical personnel indicated that Robertson was then the assistant director of nursing and had been since May 22, 2000. At that time, Stacey Kent still held the position of director of nursing.
[2] Although White had suffered from depression/anxiety in 1993 or 1994 with sleeplessness that required a psychiatric hospitalization, White sought treatment in 2000 for depression from an internist rather than a psychiatrist. White admitted that she had probably not informed LCIW of her prior problem with anxiety and depression.
[3] Dr. Williams first treated White on August 17, 1985, for high blood pressure, fever, and sinus problems.
[4] Notably, Robertson was still working as the assistant director of nursing at this time, and Ms. Kent was the director of nursing.
[5] White admitted that the statement from her doctor did not mandate that she work the day shift. Although White filed a grievance requesting to be placed back on days, she admittedly did not follow the protocol outlined in the employee handbook for obtaining an accommodation. However, she remarked that upon receipt of her grievance, no one ever informed her of the need of a specific form.
[6] White testified that she had left three different employments because she was not getting along with a co-worker.
[7] Although the Restatement is not binding on Louisiana courts, the restrictions and guidelines established therein for policy reasons do provide guidance to our courts in the adjudication of these claims. Nicholas v. Allstate Ins. Co., 99-2522 (La. 8/31/00), 765 So.2d 1017, 1021 n.4.
[8] See Nicholas, 765 So.2d at 1027.
[9] See Almerico v. Dale, 05-749 (La. App. 5th Cir. 3128/06), 927 So.2d 586, 592, citing Nicholas, 765 So.2d at 1027.
[10] See Rabalais v. St. Tammany Parish School Bd., 06-0045 (La. App. 1st Or. 11/3/06), 950 So.2d 765, 771, writ denied, 06-2821 (La. 1/26/07), 948 So.2d 177.
[11] The federal law provides in relevant part:

It shall be an unlawful employment practice for an employer
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e-2(a).
[12] The trip coordinator worked at a desk handling the trips for incoming and outgoing medical treatment.
[13] Because of her deteriorating hip condition, the medical director had approved her request for the position.
[14] Supple testified that an LPN at LCIW was responsible for dispensing medication to the inmates of the facility, rendering emergency care, and caring for patients that were terminal or recovering from surgery in the LCIW infirmary.
[15] Upon her removal, a registered nurse was assigned by Robertson to the position of trip coordinator.
[16] Supple denied knowing that she was required to use an official DPSC document to request accommodations.
[17] Sections 321 and 325 were repealed by 1999 La. Acts, No. 1366, §2. See, now, LSA-R.S. 23:302(2) and 303, respectively.
[18] An employer has no duty to reasonably accommodate an employee who is not "otherwise qualified." See Riddle v. Louisiana Power and Light Co., 94-1386 (La. App. 1st Cir. 4/7/95), 654 So.2d 698, 703, writ denied, 95-1599 (La. 9/29/95), 660 Sold 871.
[19] In her August 10, 1999 letter requesting reassignment to the position of trip coordinator, Supple stated that she was capable of continuing in her present capacity despite her medical condition. Although her request was granted, her job assignment required that she also perform LPN duties.
[20] Such a conclusion is further supported by Supple's failure to show that LCIW could make any other type of accommodation, which would enable Supple to overcome her physical condition so that she would have the ability to perform the essential duties of an LPN.