991 So.2d 1 (2008)
PIPELINE TECHNOLOGY VI, LLC
v.
Don L. RISTROPH.
No. 2007 CA 1210.
Court of Appeal of Louisiana, First Circuit.
May 2, 2008.
*2 James P. Dore', Linda S. Akchin, Baton Rouge, LA, for Plaintiff/Appellee, Pipeline Technology VI, LLC.
Kirk A. Patrick, III, David F. Zuber, Baton Rouge, LA, for Defendant/Appellant, Don L. Ristroph.
Before PARRO, KUHN and DOWNING, JJ.
DOWNING, J.
This is an appeal by a landowner who defeated an expropriation action instituted by a private pipeline company. There are three issues on appeal: (1) whether the trial court erred in failing to award the landowner attorney's fees; (2) whether the trial court erred in excluding two of the landowner's witnesses prior to trial; and (3) whether the trial court erred in failing to award some of the landowner's expert witness fees. For the following reasons, we affirm the trial court judgment that denied the landowner's claim for attorney fees, excluded two of his expert witnesses, and denied his claim for some expert witness fees.

FACTS AND PROCEDURAL HISTORY
Don L. Ristroph, the defendant/appellant landowner, successfully thwarted Pipeline Technology VI, LLC's (PTVI) lawsuit to expropriate a servitude across his property to lay a benzene pipeline. Prior to trial, PTVI's motion in limine was granted, and two experts who were scheduled to testify on Mr. Ristroph's behalf were excluded by the trial court. A bench trial was held November 28-30, 2006; the trial court ruled in favor of Mr. Ristroph and dismissed PTVI's expropriation action with prejudice. At a hearing on a motion to tax costs, the trial court denied Mr. Ristroph's claim for attorney fees. It also denied Mr. Ristroph's claim for costs he had paid to the experts excluded prior to trial. The trial court also declined to *3 award the total claimed costs of Mr. Ristroph's other expert witnesses. Judgment was signed accordingly. Both Mr. Ristroph and PTVI appealed the judgment. PTVI, however, moved to dismiss its appeal on February 12, 2008, reserving all defenses and rights to the appeal filed by Mr. Ristroph. The dismissal was granted, and only Mr. Ristroph's appeal remains.

DISCUSSION

FAILURE TO A WARD ATTORNEY FEES
In Mr. Ristroph's first assignment of error, he alleges that the trial court erred in failing to award attorney fees on two grounds: (1) pursuant to La. R.S. 19:201 and (2) pursuant to La. Const. Art. I, § 4.

Statutory Provision for Attorney Fees
Under Louisiana law, attorney fees are not allowed except where authorized by statute or by contract. Smith v. Albrecht, 06-2072, p. 5 (La.App. 1 Cir. 6/8/07), 965 So.2d 879, 882. Thus, unless Mr. Ristroph can show a pertinent statute or contract providing for an award of attorney fees, such fees are not awardable.
Louisiana Revised Statute 19:201 provides as follows:
A court of Louisiana having jurisdiction of a proceeding instituted by the State of Louisiana, a parish, a municipality or an agency of any of them vested with the power of expropriation, to acquire real property by expropriation, shall award the owner of any right, or title to, or interest in such real property such sum as will, in the opinion of the court, reimburse such owner for his reasonable attorney fees actually incurred because of the expropriation proceeding, if the final judgment is that the plaintiff cannot acquire the real property by expropriation or if the proceeding is abandoned by the plaintiff. Any such award shall be paid from the same funds from which the purchase price of the property would have been paid.
The rights of the landowner herein fixed are in addition to any other rights he may have under the Constitution of Louisiana. (Emphasis added).
Mr. Ristroph argues that La. R.S. 19:201 is his statutory authority to be awarded attorney fees. He contends that when Louisiana delegated to PTVI the authority to expropriate private property, which it exercised, it became an "agent" of the state and under the statute.
The crux of Mr. Ristroph's argument is that when Louisiana conferred upon a private entity, such as PTVI, the power to take private land, an "agency" relationship was created, which puts entities like PTVI within the statute, thereby allowing an award of attorney fees. Thus, Mr. Ristroph contends that if he could show that PTVI is an agency within the meaning of the statute, he could prove his entitlement to an attorney fee award.
Mr. Ristroph cites Tennessee Gas Transmission Co. v. Violet Trapping Co.,[1] 248 La. 49, 176 So.2d 425 (1965), and Mongrue v. Monsanto Company,[2] 249 F.3d 422, 429 (5th Cir.2001), as authority for the premise that, because of this relationship with the state, PTVI now qualifies as an *4 agency under La. R.S. 19:2[3] vested with the power of expropriation. The federal court in Mongrue stated that for a private entity to qualify under Louisiana law as an agent of the government for the purposes of establishing liability for an unconstitutional taking, the entity must have been expressly delegated the power of eminent domain. Mongrue, 249 F.3d at 429.
This statement made by the Mongrue court, although dicta taken out of context, does seem to imply that in that court's opinion, when the state delegated expropriation authority to a private entity, an agency relationship was created. Mongrue, however, was not about an individual's right to attorney fees, nor was it decided by a Louisiana court. Moreover, discussion of "agency" or "agent" was not the basis of the Mongrue holding.
In presenting his argument, Mr. Ristroph uses the term "agency" in its generic, common law meaning. In Black's Law Dictionary 67 (8th ed.2004), "agency" is defined as "a fiduciary relationship created by express or implied contract or by law, in which one party (the agent) may act on behalf of another party (the principal) and bind that other party by words or actions." Louisiana civil law, however, generally speaks in terms of mandate, not agency. Louisiana Civil Code article 2989 defines "mandate" as a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal. Here, there is no contract between the state and PTVI. Nothing in the record suggests that PTVI transacts affairs on behalf of the State of Louisiana or any of the other governmental bodies described in La. R.S. 19:201.
In La. 19:2, the Louisiana legislature listed specific categories of private entities that may expropriate property under our Constitution's takings clause. However, nothing in that statute suggests that by delineating the types of private entities with power to expropriate, the legislature somehow intended all of these entities to thereby become "agents" of the state. The statute refers to the state or its political corporations or subdivisions created for the purpose of exercising any state governmental powers in La. R.S. 19:2(1); it then separately describes each other type of private entity to which the power to expropriate is granted, including common carrier pipelines in La. R.S. 19:2(8). Because these types of private entities are separately listed, the implication is that these entities are not and do not become "agents" or "agencies" of any governmental body.
The Third Circuit Court of Appeal succinctly explained in Louisiana Intrastate Gas Corporation v. LeDoux, 347 So.2d 4, 7 (La.App. 3 Cir.1977), why a similarly situated landowner was not entitled to attorney fees. It explained that La. R.S. 19:201 allows attorney fees to the landowner only when the expropriating authority is actually the state, a parish, a municipality, or an agency of any of them. Id. The court explained that the legislature, for whatever reason, limited recovery of attorney fees to a successful litigant only if the expropriation action was brought by the state or its political subdivisions and agencies. It commented that as a court, it was powerless to extend the statute's provisions by analogy to expropriators not included within its scope. Id. The court in LeDoux held that a private entity with powers to expropriate was not subject to the penalty provisions *5 set out in the statute, since it was not the state, a parish, a municipality, or any agency of them. Id. We note that the LeDoux court did not directly discuss "agency," but the ruling of the case certainly implies that it did not consider that a private entity was a state agency.
As in LeDoux, the expropriating authority here is a private entity, and not the state, a parish, a municipality, or an agency of any of them; hence the provisions of La. R.S. 19:201 do not apply. We agree with the holding in LeDoux, and no straining of the word "agency" can make the statute apply. Therefore, we are powerless to extend to Mr. Ristroph the attorney fees set forth in La. R.S. 19:201; PTVI does not fit within the statute.

Constitutional Entitlement to Attorney Fees
Mr. Ristroph next argues that La. Const. Art. I, § 4, entitled, "Right to Property," guarantees his right to attorney fee reimbursement. He claims that the phrase, "compensated to the full extent of his loss," mandates that he, the winner of this lawsuit, must be compensated for his losses, including attorney fees. Mr. Ristroph contends that this phrase means that he has a constitutional right to be reimbursed for his litigation expenses.
Section 4 (B) provides, in pertinent part, the following:
Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. (Emphasis added).
This issue was also raised in LeDoux, but the court specifically expressed no opinion as to whether Article I, § 4 of the 1974 Constitution authorized attorney fees in the event of a successful "taking" or "damaging as a result of the taking," since the article did not apply to the case because there was no "taking." LeDoux, 347 So.2d at 7 n. 2. The court explained that when Article I § 4 was read in conjunction with La. R.S. 19:9, which deals with the manner in which property is valued for the purpose of compensating the owner, it becomes apparent that the phrase "to the full extent of his loss" dealt only with a situation when the property is "taken" by expropriation. Id. Neither in LeDoux nor in this case was there a taking.
A law review article written by Professor Lee Hargrave, entitled The Declaration of Rights of the Louisiana Constitution, in 35 La. Law Rev. 1, 15-18 (1974-1975), detailed the history of how Article I, § 4 evolved through revisions at the Constitutional Convention into its final form. Pertinent excerpts of the article read as follows:
The history of Section 4 reveals a desire to increase the level of compensation beyond that provided by existing state law. The change from the 1921 Constitution's language ("just and adequate compensation") to the new phrase ("compensated to the full extent of his loss") was deliberate, prompted by a belief on the part of the sponsors that inadequate awards have been provided under existing law. The new formula comes from the 1972 Montana Constitution, and was stated by the committee in comments as "intended to permit the owner whose property has been taken to remain in equivalent financial circumstances after the taking." This level of compensation applies "in every *6 expropriation," whether by public agencies or private persons.
The change is far reaching. Explaining his proposal, Delegate Louis Jenkins indicated it would even extend to costs of litigation and attorney fees: "[A]nd even if you win, you are going to lose, because of the cost of going to court, hiring an attorney, which you'll have to pay. So this would attempt to take into account that fact." The author, too, was insistent on using the term "extent of his loss," rather [than] "the loss" to indicate that consideration be given to an owner's subjective intangible losses rather than only to objective determinations. The words, "[t]he full extent of his loss" were in the original committee proposal and were continued in the final compromise. Explaining the impact of the compromise, the author, Delegate Walter Lanier, indicated that the original breadth of the formula was to be continued. He referred also to "things which, perhaps, in the past may have been considered damnum absque injuria, such as the cost of removal and things like that...."
The debate also indicates an understanding that the formula would cover moving costs and the cost of re-establishing a business whose premises had been taken. At one point, the convention adopted an amendment requiring consideration of loss of aesthetic or historical values in locating public projects. Though this provision was not included in the final compromise language, it again displays the breadth of the provision. Giving the people more rights in this regard certainly was the aim. In any event, the convention debate tends to confirm the committee's concept of full compensation as putting one "in equivalent financial circumstances after the taking," including items not compensable under existing law. No doubt this provision will spawn much litigation, but it is clear that the level of expropriation awards must be expanded to include moving expenses, business losses because of change of location, and compensation for some intangible losses not covered under prior law. Acceptance of such a radical and expensive concept in the state's law may be partly explained by the experience of many of the delegates under recent federal legislation which had greatly increased the required payments in case of expropriations paid with federal funds.
Changing the justification for exercise of the eminent domain power from the existing constitutional language ("for public purposes" and "purposes of public utility") to a higher standard ("a public and necessary purpose") provoked intense controversy. It was only resolved by the final compromise provision which applied the higher standard to takings by private entities but continued the old standard to takings by public agencies.
* * *
Reference to "payment to the owner or into court for his benefit" was not meant to restrict the class of persons who could claim compensation to "owners" in a technical property law sense. The purpose was to give citizens more rights, and the term, as stated by the author of the final compromise, "is intended to be used in its broadest sense, in other words, a leasehold interest in land is a property right as you and I well know, and there's been some trouble over that in the past." In fact, when one couples this intent with the requirement that compensation be to the full extent of one's loss, the purpose emerges of giving protection to a broader category of persons than was previously the case. It is also clear that by referring *7 to property "taken or damaged" compensation must be given not only when ownership or a real right is taken, but also when property is damaged. (Footnotes omitted and emphasis added).
It is unclear whether Delegate Louis "Woody" Jenkins' comments suggested or proposed that a landowner would be entitled to attorney fees if he defeated having his property expropriated. However, this speculation is unnecessary, since the final version only provides attorney fees to the landowner whose property was "taken."
The record reflects that Mr. Ristroph has incurred over $150,000 in attorney fees to defeat this private pipeline entity that tried to expropriate his property. We cannot award Mr. Ristroph compensation "to the full extent of [his] loss" pursuant to Article I, § 4, since there was no "taking." Thus, this assignment of error is without merit.

EXCLUSION OF EXPERT WITNESSES
In Mr. Ristroph's next assignment of error, he argues that the trial court erred as a matter of law by excluding the testimony of Christopher Scott, Chad Scott, and John Theriot. He contends that their testimony pertained to the safety and economic impact of PTVI's proposed benzene pipeline with respect to the transportation of benzene via barge. He argues that PTVI put safety at issue when it designated Thomas Orlofsky to testify as to the "public purpose" of the expropriation. He claims that Mr. Orlofsky testified that "safety" was one of the primary purposes served by the pipeline. Mr. Ristroph argues that to contradict this issue, he was forced to retain certain experts to aptly demonstrate that the proposed benzene pipeline would not promote the health or safety of the public. He argues that the trial court erred by not allowing these experts to testify on this issue.
The decision of whether to admit or exclude expert testimony is one left to the considerable discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion. Moory v. Allstate Insurance Company, 04-0319, p. 3 (La.App. 1 Cir. 2/11/05), 906 So.2d 474, 477. The trial court plainly stated in the transcript that from a relevance standpoint, it considered the witnesses' testimony unnecessary. It also stated that testimony regarding how efficiently and safely barge traffic operated was not the issue for the court to decide. Nor was it particularly concerned about the relative safety of pipeline versus barge operations.
A trial court has discretion in conducting a trial in an orderly, expeditious manner, and to control the proceedings so that justice is done. La. C.C.P. art. 1631. This discretion includes the admissibility of a witness's testimony. Sims v. Ward, 05-0278, p. 16 (La.App. 1 Cir. 6/9/06), 938 So.2d 702, 711. These witnesses' testimony was not pertinent to the outcome of this lawsuit. Accordingly, we conclude that the trial court did not abuse its discretion in granting PTVI's motion in limine and excluding these witnesses' testimony. This assignment of error is without merit.

FULL AMOUNT OF EXPERT FEES
Mr. Ristroph argues in his final assignment of error that the trial court erred in denying the full amount of expenses he incurred in good faith in retaining experts, including those whose testimony was excluded prior to trial. He argues that he incurred $54,569.27 in costs for his experts to successfully defend his case, but he was only awarded $16,381.62. He argues that this case involved complex issues with regard to expropriation. One witness testified *8 in the field of real estate appraisal in the industrial corridor. Other witnesses testified about environmental kinodynamics, chemical engineering, transportation, and T-SCREEN air modeling. Mr. Ristroph contends that the paperwork accompanying their bills demonstrates that a great deal of time was spent preparing for trial in collaboration with the other experts and individually.
The trial court has discretion to assess costs of a suit in any equitable manner. Rideau v. State Farm Mut. Auto. Ins. Co., 06-0894, p. 19 (La.App. 1 Cir. 8/29/07), 970 So.2d 564, 581, writ denied, 07-2228 (La.1/11/08), 972 So.2d 1168. On appellate review, only a showing of an abuse of discretion warrants reversal of the trial court's cost allocation. Id.
After reviewing the facts of this case and the expert costs not taxed to PTVI, we find no abuse of discretion in the trial court's allocation. This assignment of error is without merit.

DECREE
Based on the foregoing, the judgment of the trial court is affirmed. The costs of this appeal are assessed against Pipeline Technology VI, LLC.
AFFIRMED.
KUHN, J. concurs.
NOTES
[1] In Tennessee Gas Transmission the Louisiana Supreme Court stated that the only way a private entity obtains the power to expropriate is when it has been vested with this power by the state.
[2] Mongrue, the U.S. 5th Circuit recognized that the power of eminent domain must have been expressly delegated by the sovereign to the private entity.
[3] The legislature listed specific categories of private entities that may expropriate property under our Constitution's takings clause.