INTERIOR/EXTERIOR BUILDING SUPPLY, L.L.P.
v.
THOMAS B. HATFIELD
No. 2009 CA 0206
Court of Appeals of Louisiana, First Circuit
October 23, 2009.
Not Designated for Publication
DALE R. BARINGER, BENJAMIN J.B. KLEIN, Tarek Shahla, Baton Rouge, LA, Attorneys for Plaintiff-2nd Appellant Interior/Exterior Building Supply, L.L.P.
JAMES A. ROUNDTREE, Monroe, LA, Attorney for Defendant-1st Appellant Thomas B. Hatfield.
BEN BEYCHOK, Baton Rouge, LA, Attorney for Defendant-Appellee. Doug Welborn, Clerk of Court of the 19th JDC
Before: WHIPPLE, HUGHES, and WELCH, JJ.
WELCH, J.
Defendant, Thomas B. Hatfield, appeals a judgment finding him in breach of a contract to purchase real estate and awarding damages, as well as a trial court's judgment notwithstanding the verdict increasing the jury's damage award. Plaintiff, Interior/Exterior Building Supply, L.L.P. (Interior/Exterior), also appeals, contesting quantum. We reverse the judgment notwithstanding the verdict, reinstate the jury's damage award, and affirm in all other respects.

BACKGROUND
In the latter part of 2002, Interior/Exterior, a company engaged in the building supply business, began negotiating for the purchase of a 9.67 acre tract of land and improvements thereon located at 8675 Choctaw Drive in Baton Rouge, Louisiana (the Hatfield property). Mr. Hatfield, the owner of the property, listed the property with Sealy & Falgoust Real Estate, L.L.C., through its agent Edward Rotenberg. Bob Kirby, also of Sealy & Falgoust, represented Interior/Exterior in the negotiations. Around the same time, another company, Pierce Hardy Limited Partnership (Pierce Hardy), was also negotiating for the purchase of the Hatfield property. On February 10, 2002, Pierce Hardy offered to purchase the property for $1,000,000.00. On that date, Mr. Rotenberg was notified that the million dollar offer was Pierce Hardy's final offer.
On the morning of February 14, 2003, Interior/Exterior made an offer to purchase the property for the sum of $1,020,000.00 with a noon deadline. Mr. Hatfield received the purchase agreement, made several changes, including increasing the deadline for acceptance of the offer to 5:00 p.m., and faxed the offer to Mr. Kirby at approximately 4:44 p.m. Mr. Kirby faxed the document to Clay Geary, Interior/Exterior's representative negotiating the sale, who, with approval from Interior/Exterior's attorney, accepted the changes, initialed the document, and faxed it back to Mr. Kirby. Mr. Kirby faxed the document to Mr. Hatfield, who received the document at 5:09 p.m. Mr. Kirby called Mr. Hatfield to verify that Mr. Hatfield received the document, and Mr. Hatfield thanked Mr. Kirby for his efforts in getting the parties to an agreement and was looking forward to the closing.
On February 17, 2003, Interior/Exterior sent Mr. Kirby a deposit in the amount of $50,000.00, which was received by Mr. Rotenberg on the next day and deposited into Sealy & Falgoust's escrow account. Mr. Rotenberg apprised Mr. Hatfield that the deposit had been received.
On February 19, 2003, Branon Pesnell, the real estate agent representing Pierce Hardy, apprised Mr. Rotenberg that Pierce Hardy would purchase the Hatfield property for the sum of $1,100,000.00. He advised that if Mr. Hatfield was "able to release himself from the obligation of the current contract," Pierce Hardy would sign the agreement simultaneously with Mr. Hatfield via mutual fax transmission. On February 21, 2003, Mr. Hatfield and Pierce Hardy signed a purchase agreement to sell the Hatfield property for the sum of $1,100,000.00. Mr. Hatfield signed the agreement at the clerk of court's office, where the agreement was thereafter recorded.
On February 21, 2003, Mr. Hatfield's attorney wrote a letter to Mr. Rotenberg, asking that he notify Interior/Exterior that it had no contract for the sale of the property and directing Mr. Rotenberg to return Interior/Exterior's deposit. The letter explained that in the final negotiations, Mr. Hatfield offered the property to Interior/Exterior under certain conditions, one of which was that the offer be accepted by 5:00 p.m. However, the attorney stated, the offer was not accepted until 5:09 p.m. (the time at which Mr. Hatfield received Interior/Exterior's acceptance), and therefore, Interior/Exterior's acceptance of Mr. Hatfield's changes was ineffective to form a contract.
On February 27, 2003, Interior/Exterior filed this lawsuit seeking specific performance of the February 14, 2003 purchase agreement, asserting that the purchase agreement is a valid and binding contract between the parties. Alternatively, Interior/Exterior sought damages in the event the remedy of specific performance was unavailable.
On March 24, 2003, Mr. Hatfield sold Pierce Hardy the subject property. Interior/Exterior eventually located another property on Choctaw Drive from which to conduct its operations. In this lawsuit, Interior/Exterior sought to recover the following elements of damages as a result of Mr. Hatfield's alleged breach of the purchase agreement: (1) lost opportunity for savings in the amount of $271,814.61, representing additional costs in shipping over land as opposed to shipping products over rail from the time Interior/Exterior would have moved onto the Hatfield property and the time they were able to build and move to an alternative site; (2) loss of sales in the amount of $594,604.00, representing a 20% loss of business because of the storage constraints on their facility, including the rental of a temporary facility at a cost of $2,750.00 per month; and (3) loss of value in the amount of $500,000.00, representing the profit it could have made had it sold off the portion of the Hatfield property it did not intend to use, along with the difference in the total cost of the new facility it acquired and the cost of the Hatfield property in the amount of $39,529.00.
The case was tried before a jury, which found that the purchase agreement was a valid and enforceable contract for the sale of the property and that Mr. Hatfield breached that agreement. The jury also found that Mr. Hatfield did not breach the agreement in bad faith. The jury awarded, as the amount of foreseeable damages suffered by Interior/Exterior, the sum of $40,651.50. The trial court entered judgment in accordance with the jury's verdict, awarding Interior/Exterior $40,651.50 in damages. The court cast Mr. Hatfield with all court costs in the litigation, including the sum of $7,972.72 incurred through July 21, 2008, attorney fees in the amount of $60,670.00, out-of-pocket litigation expenses in the amount of $8,274.74, and expert witness fees for Interior/Exterior's appraiser, David Carlock, in the amount of $750.00.
Interior/Exterior filed a motion for judgment notwithstanding the verdict and for additur, insisting that the jury's damage award was abusively low and bore no reasonable relationship to the evidence introduced at trial. It asked the court to increase the total damage award to $748,843.61. The trial court granted a JNOV and additur, increasing the damage award to $288,314.41, and taxing an additional attorney fee in the amount of $1,500.00 for the bringing of the motion.
Both sides appealed. Mr. Hatfield challenges the trial court's failure to grant his motion for a directed verdict at the close of Interior/Exterior's case on the issue of the existence of an enforceable contract. He also seeks reversal of the jury's verdict on the basis that jury instructions given by the court were incorrect and misleading. Lastly, Mr. Hatfield contests the trial court's granting of the JNOV and challenges the trial court's attorney fee and expert witness fee as excessive. Interior/Exterior contends that the trial court erred in failing to increase the total damage award to $559,462.50.

EXISTENCE OF AN ENFORCEABLE CONTRACT
At the close of Interior/Exterior's case, Mr. Hatfield moved for a directed verdict on the basis that under the undisputed facts of this case, no contract came into existence. The trial court denied the motion, finding that there was sufficient evidence to put before the jury on the issue of whether there was an offer and acceptance. The court also stated that there was sufficient evidence of ratification to put the issue before the jury.
In his first assignment of error, Mr. Hatfield contends that the trial court should have granted his motion for a directed verdict because the evidence showed Mr. Hatfield did not accept Interior/Exterior's offer in accordance with its terms, but made three changes, which constituted a counteroffer, that was accepted by Interior/Exterior after the 5:00 p.m. deadline contained in the purchase agreement. Relying on La. C.C. arts. 1928 and 1929, which provide that an irrevocable offer expires if not accepted within the time for acceptance, Mr. Hatfield insists that his counteroffer expired when it was not accepted within the time prescribed therein, and therefore, no contract came into existence.
A motion for a directed verdict is appropriately granted in a jury trial, when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict. Walker v. Louisiana Health Management Company, 94-1396, p. 8 (La. App. 1st Cir. 12/15/95), 666 So.2d 415, 421, writ denied 96-0571 (La. 4/19/96), 671 So.2d 922. However, if there is evidence of such a quality and weight that reasonable and fair-minded persons exercising impartial judgment might reach different conclusions, the motion should be denied, and the case should be submitted to a jury. Id.
On appeal, the standard of review for legal sufficiency of the evidence challenges, such as those presented by directed verdicts, is de novo. Adam v. State, Department of Transportation and Development, XXXX-XXXX, XXXX-XXXX, p. 6 (La. App. 1st Cir. 2/13/09), 5 So.3d 941, 945, writ denied, XXXX-XXXX (La. 5/15/09), 8 So.3d 584. A directed verdict should be sustained on appeal where the reviewing court would find a jury verdict in favor of the party opposing the motion to be manifestly erroneous had the trial judge allowed the case to go to the jury. Id.
We turn to an examination of the evidence in this case. Interior/Exterior is engaged in the building supply business from locations in Louisiana, Alabama, Texas and Mississippi. Its facility in Baton Rouge, located on Lobdell Boulevard, was situated on a 1.1 acre parcel of land, had 12,000 square feet of warehouse space, and a 1,250 square foot office. Mr. Geary was aware that the company could save money by using rail shipping as opposed to land shipping, and he began looking for a suitable property with rail access to expand Interior/Exterior's Baton Rouge operations.
Mr. Kirby, a commercial realtor with the firm of Sealy & Falgoust, assisted Interior/Exterior in finding a suitable site with a minimum of three acres and rail access. Mr. Rotenberg, also of Sealy & Falgoust, was the listing agent on the Hatfield property, on which Mr. Hatfield had operated a lumber supply company. The property had rail access, a large warehouse, a smaller warehouse, a number of sheds, and an office. Beginning in December of 2002, Interior/Exterior made a series of offers to buy the Hatfield property that were rejected or countered by Mr. Hatfield. Typically, Mr. Kirby would draft the purchase agreement, send it to Mr. Geary for his signature, who would send it back to Mr. Kirby, then Mr. Kirby would submit the document to Mr. Rotenberg, who would then forward the document to Mr. Hatfield for his consideration.
In early February, Pierce Hardy, through its real estate agent, Mr. Pesnell, also made offers to purchase the Hatfield property. Mr. Hatfield rejected the offers, and countered Pierce Hardy's offer with a sales price of $1,200,000.00 on February 10, 2003. That same day, Mr. Pesnell notified Mr. Rotenberg that Pierce Hardy was submitting an offer to purchase the property for $1,000,000.00, and that figure represented its final offer. On February 11, 2003, Mr. Hatfield countered Pierce Hardy's offer with a sales price of $1,100,000.00. On February 13, 2003, Pierce Hardy again offered to buy the property for $1,000,000.00.
On February 14, 2003, Mr. Rotenberg was out of town and had authorized Mr. Kirby to communicate directly with Mr. Hatfield as to any offers submitted on the property. Early that morning, Interior/Exterior submitted an offer to purchase the property for $1,020,000.00, with a 9:00 a.m. deadline. Mr. Kirby testified that he prepared a new purchase agreement that altered the language of the "contingency period" to give Interior/Exterior 30 days after acceptance to make a thorough Phase I Environmental inspection of the property and verify that the property was serviceable by rail. The new purchase agreement provided that the offer remained binding and irrevocable until noon that day. It also provided for Interior/Exterior to make a deposit, as part of the sales price, in the amount of $50,000.00. Mr. Kirby received the purchase agreement from Mr. Geary at approximately 10:22 a.m. and forwarded it to Mr. Hatfield. Some time that morning, Mr. Kirby and Mr. Hatfield had two or three discussions about eliminating as many of the contingencies as possible. At 12:20 p.m., Mr. Hatfield faxed a copy of the Phase 1 Environmental Assessment Report update that had been prepared in 1999 by Perkins Consulting Group on behalf of Mr. Hatfield's bank, to Mr. Geary. Mr. Hatfield admitted it was his impression that Pierce Hardy was "out of the game" at this point.
After receiving the offer, Mr. Hatfield made several written notations on the document. First, he changed from ten to two days the time by which the act of sale was to be passed following the expiration of the contingency period. He also added language giving him the option to provide affirmative title insurance to protect the buyer from the risk of a title defect. Lastly, Mr. Hatfield changed the time the offer remained binding and irrevocable from noon to 5:00 p.m. that day.
The evidence shows that Mr. Hatfield faxed the purchase agreement containing the changes and a cover letter to Mr. Kirby at approximately 4:44 p.m. In the cover letter, Mr. Hatfield acknowledged that he signed the agreement for sale of the property to Interior/Exterior with only two changes: the timing of the act of sale back to two days from the ten days in Interior/Exterior's proposal and adding language to give him the right to buy affirmative title insurance. At approximately 4:49 p.m., Mr. Kirby faxed a copy of the purchase agreement to Mr. Geary. Mr. Geary consulted with his lawyer and initialed the changes, then faxed the purchase agreement containing his acceptance of the changes to Mr. Kirby at approximately 5:07 p.m. Mr. Kirby then faxed the purchase agreement to Mr. Hatfield, who received it at 5:09 p.m.
Mr. Kirby testified that after sending the purchase agreement to Mr. Hatfield, he called Mr. Hatfield and verified that Mr. Hatfield received the document. Mr. Hatfield thanked Mr. Kirby for working so hard to put the deal together, and Mr. Kirby assured Mr. Hatfield that he would do everything he could to keep the due diligence investigation as short as possible. Mr. Hatfield confirmed the conversation did occur, acknowledging that he thanked Mr. Kirby for his efforts, and told him he was looking forward to the closing. Mr. Hatfield did not say anything about the fact that the fax came in after 5:00 p.m. Mr. Hatfield testified that at this time, he believed that he had reached an agreement with Interior/Exterior.
On February 17, 2003, Interior/Exterior wrote a check for a deposit on the purchase price in the amount of $50,000.00, which was deposited into Sealy & Falgoust's sales escrow account the following day. Mr. Rotenberg apprised Mr. Hatfield that the deposit had been received. On February 17, 2003, Mr. Geary and G. Scott Perkins of the Perkins Consulting Group signed an agreement authorizing the Perkins Consulting Group to update the Phase I Environmental Site Assessment. The agreement set forth a completion date of February 20, 2003.
On February 19, 2003, Mr. Pesnell wrote a letter to Mr. Rotenberg on behalf of Pierce Hardy presenting an offer to purchase the subject property for the sum of $1,100,000.00. The letter stated that if Mr. Hatfield was "able to release himself from the obligation of the current contract," Pierce Hardy would sign the agreement simultaneously with Mr. Hatfield by mutual fax transmission. Mr. Pesnell testified that Mr. Rotenberg made it very clear to him that another offer had been accepted on the property. Mr. Pesnell stated, however, that his client was presenting a "back-up" offer in the event the other offer had been declared null and void.
On February 21, 2003, Mr. Hatfield's attorney sent a letter to Mr. Rotenberg asking him to notify Interior/Exterior that there was no contract for the sale of the property and directing him to return Interior/Exterior's deposit. The letter stated that Mr. Hatfield offered to sell the property to Interior/Exterior under certain conditions, one of which was that the offer be accepted by 5:00 p.m. The letter indicated that because the offer was not accepted until 5:09 p.m. (the time Mr. Hatfield received acceptance of the offer), it was ineffective to form a contract. That same day, Mr. Hatfield and Pierce Hardy signed an Agreement of Sale for the subject property at the East Baton Rouge Parish Courthouse, then recorded the document into the conveyance records. Mr. Hatfield admitted that this was done to ensure that the Pierce Hardy purchase agreement would be recorded before the Interior/Exterior purchase agreement so that Pierce Hardy's rights would prime Interior/Exterior's rights in the event a dispute arose between those two parties. On March 24, 2003, Mr. Hatfield and Pierce Hardy executed a cash deed of the subject property.
The propriety of a directed verdict must be evaluated in light of the substantive law underpinning the claims. Walker, 94-1396 at p. 9, 666 So.2d at 421. A contract to sell is formed by the consent of the parties established through offer and acceptance. La. C.C. art. 1927. An offer that specifies a period of time for acceptance is irrevocable during that period of time. La. C.C. art. 1928. An irrevocable offer expires if not accepted within the time prescribed in article 1928. La. C.C. art. 1927. The acceptance of an irrevocable offer is effective when it is received by the offeror within the time named in the offer. La. C.C. art. 1934. An acceptance of an offer that is not in accordance with the terms of an offer is deemed to be a counteroffer. La. C.C. art. 1943.
On the motion for directed verdict, the trial court was asked to determine whether reasonable persons could not have found that a valid and enforceable purchase agreement had been perfected between the parties. We agree that reasonable persons could have found the existence of a valid contract under the circumstances of this case. The jury could have found that Mr. Hatfield ultimately accepted Interior/Exterior's offer to purchase the property despite the fact that Interior/Exterior's acceptance of the terms of his counteroffer reached Mr. Hatfield at 5:09 p.m. Mr. Hatfield's confirmation to Mr. Kirby shortly thereafter that he received the agreement, his thanking Mr. Kirby for his help in reaching an agreement, and his testimony that he thought he had an agreement to sell his property at this time, coupled with his acceptance of Interior/Exterior's deposit, are facts from which the jury could find that Mr. Hatfield accepted Interior/Exterior's offer to purchase the property for $1,020,000.00. The issue of the 5:00 p.m. deadline did not even arise until Mr. Hatfield received a better offer from Pierce Hardy, a potential buyer Mr. Hatfield felt was "out of the game" when he accepted Interior/Exterior's offer of $1,020,000.00. Under these circumstances, we find no error in the trial court's denial of the motion for a directed verdict.

JURY INSTRUCTIONS
Mr. Hatfield next levies numerous challenges to the trial court's jury instructions, claiming they were incorrect or misleading. The record reflects that the trial court instructed the jury that this case involved a suit for an alleged breach of contract, that a contract is formed by the consent of the parties, and that the jury had to decide whether or not there was a contract. Mr. Hatfield cites six instances in which the court, when giving instructions on contract interpretation, referred to "the contract at issue in this case." On two other occasions, the court mentioned "the contract." Mr. Hatfield insists that these instructions prejudiced the jury because in each, the trial court was telling the jury that there was a contract to be interpreted. He also submits that: an instruction on ratification should not have been given; the instruction on counteroffer was incorrect; the jury should not have been instructed on the principles of contract interpretation as this case did not involve an ambiguous contract, and some other instructions were unrelated to the facts of this case.
Louisiana Code of Civil Procedure article 1792(B) requires the trial court to instruct jurors on the law applicable to the cause submitted to them. Trial courts are given broad discretion in formulating jury instructions, and appellate courts must exercise great restraint before reversing a jury verdict because of erroneous jury instructions. LeBlanc v. Landry, XXXX-XXXX, p. 3 (La. App. 1st Cir. 6/24/09), ___ So.2d ___, ___. The adequacy of jury instructions must be determined in light of the jury instructions as a whole. When small portions of jury instructions are isolated from context and are erroneous, the error is not necessarily prejudicial. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. LeBlanc, XXXX-XXXX at pp. 3-4.
We note that the trial court may have erroneously instructed the jury on principles of law that were not applicable in this case. However, viewing the jury instructions as a whole, we cannot say that the jury was so misled to the extent it was prevented from dispensing justice. The court clearly instructed the jury that Interior/Exterior was suing for an alleged breach of contract, that a contract is formed by the consent of the parties, and that the jury had to decide whether or not there was a contract. Moreover, we do not find the trial court's reference to "the contract" to be prejudicial. We believe the instructions as a whole informed the jury that the ultimate decision it had to make was whether Interior/Exterior and Mr. Hatfield entered into a valid and enforceable contract. Accordingly, if the trial court committed any error in instructing the jury, we find it was harmless.

JUDGMENT NOTWITHSTANDING THE VERDICT
Louisiana Code of Civil Procedure article 1811 provides that a motion for a judgment notwithstanding the verdict may be granted by a trial court on the issue of damages. The standard to be used in reviewing a JNOV, as stated in Smith v. State, Department of Transportation & Development, XXXX-XXXX, XXXX-XXXX, pp. 12-13 (La. 3/11/05), 899 So.2d 516, 524-525, is as follows:
[A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences of factual questions should be resolved in favor of the non-moving party.
* * *
When reviewing a district court's grant of a JNOV, an appellate court must initially determine whether the district judge erred in granting the JNOV by employing the above-mentioned criteria in the same manner as the district judge in deciding whether to grant the motion. In other words, the appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of fact. If the answer is in the affirmative, then the appellate court must affirm the district court's grant of JNOV. However, if the appellate court determines that reasonable minds could differ, then the district court erred in granting the JNOV and the jury verdict should be reinstated. (Citations omitted)
At trial, Interior/Exterior sought to establish three main elements of damages: (1) the difference in the cost of buying and renovating the improvements on the Hatfield property and the total cost of the land it did purchase coupled with the improvements made on that property to operate its facility; (2) the amount it could have realized from the sale of that portion of the Hatfield property it did not intend to use; and (3) the money it would have saved in shipping costs had it been able to ship its drywall purchases by rail instead of by truck.
Mr. Geary testified that Interior/Exterior paid $195,000.00 for the land upon which it constructed an 18,200 square foot warehouse and a 2,760 square foot building, a rail switch and other improvements for a total cost, with the land, of $1,321,850.60. In contrast, he stated the total cost of the Hatfield property would have been $1,282,321.00, representing the purchase price of $1,020,000.00 and the costs estimated to renovate the buildings already on the Hatfield property. In addition to the difference in those two figures of $39,529.60, Interior/Exterior sought to recover the market value of 5.17 acres of the Hatfield property. Mr. Geary testified that Interior/Exterior was planning to sell 5.17 acres of the Hatfield property. Interior/Exterior presented the testimony of David Carlock, who was accepted by the court as an expert in the field of real estate appraisal. Mr. Carlock testified that the property was worth $55,000.00 per acre, but performed his estimate of the total value of the property on only 4.25 acres because of the presence of a building on part of the property. Mr. Carlock testified that the total value of the excess land was $235,000.00. Mr. Geary also testified that Interior/Exterior leased another facility for a six-month time period because of space constraints at its Lobdell facility for a total rental fee of $16,500.00.
On the issue of shipping savings, Mr. Geary was asked to give a calculation of the total savings that would have been experienced by Interior/Exterior if it had rail access and could have received its drywall products by rail from the period of May 14, 2003, the time Interior/Exterior projected it would have moved onto the Hatfield property, through August of 2004, the time Interior/Exterior rented another facility. Mr. Geary testified that from May 14, 2003 through August 13, 2004, 10,029,098 square feet of drywall was delivered by truck that could have been brought in by rail. Mr. Geary explained how he reached his calculation of the total savings Interior/Exterior would have had if it had rail access and could have received drywall by rail during the pertinent time period as follows:
Well, what we did is we took the total gypsum board that we received from October 1 of '04 through 9-30 of '06, a two-year frame, and then we took the percentage of rail that we received for that period of time. Then we went back to the period of time, May 14 of '03 through September 30th of '04 and applied that same percentage to the gypsum board that we received for that period of time, and we came up with a square footage that we could have received by rail during the period in question of ten million twenty-one thousand ninety-eight square feet at a rate difference of a penny a square foot, which comes out to a hundred thousand two hundred eleven dollars.
Lastly, Interior/Exterior sought to recover $700.00, representing the fee paid to Perkins Consulting Group for an environmental assessment, although Mr. Geary acknowledged that he did not know if the services paid for had actually been performed, as well as the sum of $522.50, representing the fee paid to a closing attorney hired by Interior/Exterior prior to Mr. Hatfield's breach of the purchase agreement.
After the presentation of the evidence, the jury awarded foreseeable damages in the amount of $40,651.50. In granting the JNOV, the trial court observed that it was "dumbfounded" by the jury's damage award, and stated that the "hard numbers that were undisputed" was the difference in the shipping costs in the amount of $271,814.61. The judge awarded this amount in addition to the "sixty thousand five hundred extra" to arrive at a figure of $288,314.61, which, according to the trial court, represented the minimum a reasonable jury could have awarded for damages associated with Mr. Hatfield's breach of the purchase agreement.
Mr. Hatfield contends that the trial court erred in granting the JNOV, urging that there is nothing "hard" or undisputed about the sum of $271,814.61 found by the trial court to constitute the difference in the shipping costs, as Mr. Geary testified that Interior/Exterior would have saved $100,211.00 had it shipped drywall by rail during the period in question. We agree. Furthermore, we find that a reasonable jury could have found that Interior/Exterior failed to prove the alleged loss of profits it could have realized by shipping drywall by rail as opposed to shipping those products by truck.
The general measure of damages for breach of an obligation is a sum which would place the plaintiff in the same position as if the obligation had been fulfilled. Nippert v. Baton Rouge Railcar Services, Inc., 526 So.2d 824, 827 (La. App. 1st Cir.), writs denied, 530 So.2d 84, 87, 91 (La. 1988). The assessment of damages by a jury is a determination of fact that is entitled to great deference on review. Smith, XXXX-XXXX at p. 16, 899 So.2d at 526-527. After reviewing the record, we are convinced that in entering an award for $40,651.50, the jury decided that the proper measure of damages for Mr. Hatfield's breach was the difference in the amount Interior/Exterior would have paid for the Hatfield property and to renovate the improvements thereon and the amount Interior/Exterior actually paid to purchase the substitute property and construct improvements thereon. The evidence showed Interior/Exterior paid $39,526.60 more to purchase the substitute property and construct improvements to carry on its operations than it would have expended had the sale of the Hatfield property been perfected. We also believe the jury awarded Interior/Exterior part of the $1,200.00 it sought to recover for payment of fees to the consulting group and the title attorney. The jury was well within its discretion to decline to award Interior/Exterior any sums for value of that portion of the Hatfield property it had planned to sell on the open market. While there was testimony as to the value of the excess property, there was no evidence to indicate Interior/Exterior had lined up a buyer for this property and any award for this element of damages would have required sheer speculation on the part of the jury.
Moreover, the jury was well within its discretion in declining to award any sums for the difference in shipping costs Mr. Geary attempted to identify at trial. It is well settled that a claim for lost profits, as an element of damages for a breach of contract, may only be recovered where they are not speculative or uncertain in their nature, and are susceptible of proof with reasonable certainty. See Landry v. Bourque, 460 So.2d 33, 34 (La. App. 1st Cir. 1984), writ denied, 464 So.2d 1378 (1985). Mr. Geary attempted to show the amount of drywall that was brought in by truck that could have been brought in by rail during the "period of delay," which he identified as May 14, 2003 through August 13, 2004. To make this calculation, he used the percentage of purchases that had been shipped by rail from October of 2004 through September of 2006. Mr. Geary's calculations assumed that the same percentage of drywall purchases shipped over this two-year period by rail would have been shipped from May 14, 2003 through September of 2004. This calculation also assumed that purchases of gypsum board were comparable during the two time periods. The jury was free to reject these assumptions as speculative and could have reasonably found that Interior/Exterior did not prove this element of damages to a reasonable certainty.
Under the circumstances of this case, we find that the trial court improperly substituted its fact determination for that of the jury, and in so doing, erred in granting the JNOV to award shipping costs as an element of recoverable damages. Accordingly, because the jury's award of $40,651.50 for damages resulting from Mr. Hatfield's breach of the purchase agreement is reasonably supported by the record and was well within the jury's discretion, we reinstate the jury's general damage award.[1]

FEES
Lastly, Mr. Hatfield challenges the trial court's attorney fee award and expert witness fee award. The purchase agreement provides that the defaulting party shall be liable for "all attorneys' fees and other costs incurred in the enforcement of any and all rights under this contract." Interior/Exterior sought to recover $60,670.00 in attorney fees, $8,274.74 in out-of-pocket costs incurred in pursuing enforcement of the purchase agreement, and an award fixing the expert witness fees of Mr. Carlock in the amount of $3,700.00. Mr. Hatfield challenged the attorney fee request on the basis that his attorney's fees were less than onethird the amount that Interior/Exterior sought to tax as costs and fees, and claimed that the amount sought was unwarranted by the nature of this case and the results achieved in it. Mr. Hatfield challenged the expert witness fee on the basis that the jury refused to award Interior/Exterior any amounts for the value of that portion of the Hatfield property it would have sold had it purchased it, and therefore, Mr. Carlock's appraisal was of no assistance to the jury.
On appeal, Mr. Hatfield challenges the attorney fee award as being unreasonable, asserting merely that plaintiffs counsel's fees were three times the amount of his attorney's fee. The trial court has the ultimate discretion to determine the amount of attorney fees that may be recovered based on the court's own knowledge, the evidence, the court's observation of the case, and the record. Fern Creek Owners' Association, Inc. v. City of Mandeville, XXXX-XXXX, p. 11 (La. App. 1st Cir. 6/30/09), ___ So.2d ___, ___. On appeal, only a showing of abuse of discretion would warrant reversal of the trial court's attorney fee award. Mr. Hatfield failed to show how the trial court abused its discretion in setting the award, and we find no error therein.
Mr. Hatfield also contests the trial court's expert witness fee of $750.00. The only expert witness retained by Interior/Exterior was Mr. Carlock. Mr. Hatfield submits that the jury did not accept the testimony of plaintiffs expert, and therefore, the court should not have entered an award for expert witness fees. Although the purchase agreement authorized Interior/Exterior to recover all costs incurred in enforcing the agreement, the trial court awarded only a portion of Mr. Carlock's fee, obviously believing a lesser award was appropriate in light of the fact that the jury did not award damages based on Mr. Carlock's testimony. A trial court is vested with broad discretion to assess costs in any equitable manner. Pipeline Technology VI, LLC v. Ristroph, XXXX-XXXX, p. ___ (La. App. 1st Cir. 5/2/08), 991 So.2d 1, ___, writ denied, XXXX-XXXX (La. 10/24/08), 992 So.2d 1037, cert. denied, ___ U.S. ___, 129 S.Ct. 1595, 173 L.Ed.2d 678 (2009). We find no abuse of the trial court's discretion in setting the expert witness fee award.

CONCLUSION
For the foregoing reasons, the October 28, 2008 judgment, granting plaintiffs motion for JNOV, increasing the jury's damage award, and awarding plaintiff an additional $1,500.00 as attorney fees is hereby reversed. The July 31, 2008 judgment in favor of plaintiff, Interior/Exterior Building Supply, L.L.P., and against defendant, Thomas B. Hatfield, rendered in accordance with the jury's verdict, is hereby reinstated and affirmed in all respects. All costs of this appeal are assessed equally to appellants.
OCTOBER 28, 2008 JUDGMENT NOTWITHSTANDING THE VERDICT REVERSED; JULY 31, 2008 JUDGMENT REINSTATED AND AFFIRMED.
NOTES
[1] Because of our resolution of this issue, it is unnecessary to further address Interior/Exterior's contention that the trial court erred by failing to additionally increase the damage award after granting the JNOV.